[Crim. No. 21436 Jan. 2, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
FERMIN RODRIGUEZ LEDESMA, Defendant and Appellant.

[Crim. No. 23178. Jan. 2, 1987.]

In re FERMIN RODRIGUEZ LEDESMA on Habeas Corpus.

172

COUNSEL

Robert R. Bryan, under appointment by the Supreme Court, for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Edward P. O'Brien, Assistant Attorney General, Ann K. Jensen and Dane R. Gillette, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant was convicted of first degree murder (Pen. Code, § 187), kidnapping (*id.,* § 207), and two counts of robbery (*id.,* § 211); special circumstance allegations of the intentional killing of a witness (former Pen. Code, § 190.2, subd. (c)(2)), felony-murder robbery (*id.,* subd. (c)(3)(i)), and felony-murder kidnapping (*id.,* subd. (c)(3)(ii)) were found true; and defendant was sentenced to death (*id.,* § 190 et seq.). Defendant appeals (Pen. Code, § 1239, subd. (b)), and also petitions for habeas corpus on the ground that he was denied his constitutional right to the effective assistance of counsel at trial. The proceedings have been consolidated for decision.

To assist this court in resolving the ineffectiveness claim, we appointed the Honorable Joseph P. Kelly, Judge of the Superior Court of Santa Clara County, Retired, as referee to take evidence and make findings of fact and conclusions of law regarding that claim. Following the hearing, the referee filed his report. He concluded that defendant's trial counsel was incompetent in several particulars, that as a result he subjected the defense to prejudice, and hence that he failed to provide defendant with effective assistance. Accordingly, he recommended that the petition be granted and the writ issue.

As we shall explain, we adopt the referee's report in relevant part and follow the referee's recommendation, and hence grant the petition and vacate the judgment of conviction.

I. THE FACTS

On August 26, 1978, Gabriel Flores was working as an attendant at the Hudson Oil Company gasoline station at 437 West San Carlos Street in San Jose. About 5:15 p.m. two men rode into the station on a motorcycle; the driver got off, drew a white-handled gun, robbed Flores of money and some other items, and then mounted the motorcycle and sped off. Flores gave the

police the license plate number of the motorcycle and a description of the robbers.

Not long afterwards San Jose Police Officer Ronald Webster, who was on patrol in the general area, received a report of the robbery and a summary of the information Flores provided. He requested a registration check and was informed that the suspect motorcycle was registered to defendant at 985 South First Street in San Jose. He proceeded to that address and was soon joined by two other officers. The three parked out of sight and set up a stake-out in the hope that the motorcyclist would return. After about half an hour they approached the front door and encountered the occupant, Leticia Mejia, and stated that they were looking for defendant. Mejia, defendant's former girlfriend, told them that he used to live there but had moved several months earlier, that she thought he was then living in the area of Third and Hedding Streets, and that he drove a white Cadillac when he was not riding his motorcycle.

Officer Webster proceeded to the area of Third and Hedding Streets, went up and down the streets looking for a white Cadillac, and eventually found one parked in the driveway of a duplex at 960 North Fourth Street. Parking about a block away, Webster requested a registration check and was informed that the vehicle was registered to defendant at 960 North Fourth Street. He returned to the duplex and staked it out for between 20 and 30 minutes. He then called for Officers Habina and Maria Guerra to help him approach the duplex. He and Habina went to the front door and Guerra went around back.

At the door they encountered Lawrence Santiago and Millie Dominguez, and told them they were looking for defendant and his motorcycle in connection with a robbery that had been committed earlier that afternoon. Santiago and Dominguez stated that defendant was not home at the time. Without a warrant the three officers, who were armed and in uniform, then entered the apartment, ordered Santiago and Dominguez to remain in the living room and not move, and conducted an unsuccessful search for defendant. As they were questioning Santiago and Dominguez after completing the search, the telephone rang. The officers prohibited Santiago and Dominguez from answering. Officer Guerra picked up the receiver, identified herself in Spanish as "Millie," and was told by the caller—who said he was defendant—that he was "hot" and knew the police were after him, and that she should lock the apartment and the white Cadillac and take a walk.

Three days later, on August 29, 1978, San Jose Police Sergeant Robert Traskowski, who was in charge of the robbery investigation, presented to

Flores a display of six photographs; defendant's was included and was marked Number 4. After studying the photographs for a minute, Flores pointed to Number 4 and said, "No. 4 looks like the guy." When asked whether he was sure that Number 4 was the robber, he looked at the photograph about 10 seconds and responded, "No. 4 is the only one that looks like him." When asked later that day, "Is the man in photograph #4 the same one who had the gun and took the money?," he answered, "Yes." Traskowski then obtained a robbery complaint against defendant and a warrant issued for his arrest. Beyond Flores's identification, no eyewitness or physical evidence linked defendant to the crime.

At 8:15 p.m. on September 5, 1978, the San Jose police arrived at the Hudson Oil Company gasoline station at 437 West San Carlos Street in response to calls from customers stating that the station was unattended. They found that the station appeared to be open for business; on the office counter sat a cigarette smoldering in an ashtray and a half-empty bottle of cold Coca-Cola; although some money and a tapestry were missing, rolls of coins remained on the counter in plain view. The police determined that the person on duty that night was Flores. The bicycle he used to ride to and from work remained at the station.

On September 8, 1978, Flores's body was discovered in an embankment off Hecker Pass Road in the heavily wooded mountains of southern Santa Clara County near Gilroy. The body bore one gunshot wound in the top of the head, one in the back, and two in the abdomen, and several stab wounds in the chest. No eyewitness or physical evidence linked defendant to whatever occurred at the gasoline station on September 5 or to the murder.

Sometime in the late summer or early fall of 1978 defendant went to Salt Lake City, where he remained until the middle of March 1979. Soon afterwards he returned to San Jose and was arrested.

## II. PRETRIAL AND TRIAL

Defendant was charged with robbing Flores on August 26, 1978, and September 5, 1978, and with kidnapping and murdering him; as to the murder count, special circumstances of intentional killing of a witness, felony-murder robbery, and felony-murder kidnapping were alleged. At the preliminary hearing defendant was represented by Deputy Public Defender David Johnson. He was held to answer, and entered a plea of not guilty and denied the special-circumstance allegations. Not long afterwards he retained Jefferson M. Parrish, Jr., as counsel and substituted him for the public defender.

With a single exception, Parrish made no motions before trial. The exception was a successful request under Evidence Code section 1017 for the appointment of a psychiatrist, John P. Glathe, M.D., to examine defendant. The request had been drafted by the public defender's office, but was altered to bear Parrish's name and address in place of the public defender. Prior to trial the following colloquy took place between the court and Parrish.

"THE COURT: . . . In connection with the case, as I understand it, it's a single plea of not guilty. And Mr. Parrish, you've had the opportunity of psychiatric evaluation assistance and preparation of your case, as I understand it?

"MR. PARRISH: Yes, your Honor, I have.

"THE COURT: There is no insanity plea in the case?

"MR. PARRISH: No. I feel that's not a plea in this case.

"THE COURT: And in connection with the matter, I don't wish to delve into your defense in any way or ask you to divulge anything that would be adverse to your client. But in view of the recent cases, I want to make sure that you have considered the possibility of diminished capacity in a case of this nature.

"MR. PARRISH: Yes, your Honor. I have considered both [after reviewing] the psychiatric examination and also the strategy and defense of the case and decided not to use that as a defense."

Prior to trial, as the habeas corpus record reveals, the prosecutor, George Kennedy, committed himself in Parrish's presence not to introduce the victim's extrajudicial identification of defendant.

Jury selection spanned five court days. Without any objection on the part of Parrish, the voir dire was conducted in open court and without sequestration.

On the third day of jury selection the court effectively raised sua sponte the issue whether the prosecutor was using his peremptory challenges to strike Hispanics on the ground of group bias alone in contravention of the rule declared in *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal. Rptr. 890, 583 P.2d 748], and its progeny. By this time the prosecutor had already stricken, among others, prospective jurors Amelia Maes, Michael A. Logan, and Lupe Jiminez: Maes spoke Spanish and was evidently Hispanic; Jiminez also spoke Spanish and was evidently Hispanic; Logan appears not

to have been Hispanic, but was married to a member of that group. It is not clear from the record which, if any, of the other prospective jurors whom the prosecutor had peremptorily challenged was Hispanic. The transcript of the *Wheeler* hearing is as follows.

"THE COURT: Record show Counsel and Defendant present. All the prospective jurors have left the courtroom. [¶] I wanted to call to your attention, gentlemen, you may already be aware of it. The holding in the Second District Court of Appeal that ruled a defendant's right to [a jury drawn from] a fair cross-section of [the community is] violated when the prosecution used peremptory challenges to remove all Spanish speaking people from the jury. In that case, apparently, I don't have the excerpt from the *Post-Record,* but there were prospective jurors that were informed that all the witnesses would speak only Spanish and the interpreter could be sworn to translate the testimony into English. And in that case, the prosecutor had some concern [that] Spanish speaking members would be inclined to use their own translation into English of the testimony given in Spanish. In that case, *People* v. *Lavario,* the Court of Appeal would not [subscribe] to that theory. [Here] I don't perceive that there has been any pattern by the prosecution of excusing Spanish speaking persons by way of deliberate discrimination. There's still several Spanish speaking people who understand Spanish on the jury. [It] simply was to call this to your attention, gentlemen.

"MR. PARRISH: Judge, as I recall, wasn't there a case where everybody was—who was called who was not impaneled, voir dired was [removed by peremptory challenge]? Everybody who had any Spanish background?

"THE COURT: Well, excerpts that I'm reading from is—

"MR. PARRISH: It's not just the case of excluding one or two, I assume?

"THE COURT: To remove all Spanish speaking people from the jury. That apparently means all other—

"MR. PARRISH: Your Honor—

"MR. KENNEDY: I'm familiar with that case. It's certainly no problem with respect to that in this case. My state of mind on excusing Spanish speaking jurors I did excuse was that, for example, Mrs. Jiminez knew the defendant from high school. I thought that might create a problem. I think another Spanish speaking juror I might have excused gave me dirty looks. I felt that they didn't care for me personally. And I had reasons such as that for excusing those that I did. My feeling is that Spanish speaking members of our community make excellent jurors and [it] has nothing to do with race, language, anything like that. On the occasion when I did excuse those jurors, and [if] Mr. Parrish wants to delve further into any state of mind

with respect to that, I'd be happy to explain my reasons for him on the record.

"THE COURT: Very good. I notice that there are the problems with the jurors that you had excused. Mrs. Maes who is Spanish speaking, there was a death case involved. And Mrs. Jiminez had attended the same high school as the defendant and recognized him. [¶] In any event, I wanted it on the record and called to your attention, gentlemen. Thank you."

Shortly after the hearing the prosecutor peremptorily challenged prospective juror Alan F. Porcella and later struck, among others, prospective jurors Jose Flores, C. Carrie Corral, and Robert A. Bagnod. Porcella spoke Spanish and may have been Hispanic; Flores and Corral spoke Spanish and were evidently Hispanic; Bagnod was Hispanic and understood Spanish. At no time while the prosecutor was exercising his peremptory challenges against these or any other prospective jurors did Parrish make any objection or attempt to raise the *Wheeler* issue.

The prosecutor also challenged 16 prospective jurors for cause solely on the ground of their opposition to the death penalty. Without challenge by Parrish a prospective juror whose mother had been beaten, sexually assaulted, and murdered was sworn as a member of the jury. At no time during jury selection did Parrish raise an objection of any kind.

In his opening statement the prosecutor presented in brief what he intended to prove in his case in chief, and stated without objection on the part of Parrish that the victim had identified defendant as the robber. Parrish made no opening statement.

In the course of presenting his case the prosecutor called Sergeant Traskowski. Traskowski generally described his participation in the investigation of the August 1978 robbery. Evidently because of his commitment not to introduce the victim's extrajudicial identification of defendant, the prosecutor did not elicit, and Traskowski did not give, any express testimony on this point:

"Q. (By Mr. Kennedy) Showing you People's 11, have you ever seen this before? A. Yes, I have.

"Q. And where have you seen that before? A. This is a photo lineup that I prepared with reference to Mr. Ledesma.

"Q. All right. And is that the one that you prepared in connection with the investigation of the robbery that took place at the Hudson Gas Station on the 26th of August, 1978? A. Yes.

"Q. Now, the following day, after you compared [*sic*] that lineup with Mr. Ledesma's picture in it, did you go out and show that lineup to a Mr. Gabriel Flores? A. Yes, I did.

"Q. And did you go out there about 9:30 in the morning on the 29th of August in order to show him that lineup? A. Yes.

"Q. Was Mr. Flores told to be careful if he were able to select anyone and not to pick out anyone if he wasn't sure? A. Yes.

"Q. Okay. Was he admonished it was not necessary by any means for him to pick out anyone among those people photographed there in that lineup? A. Yes, he was.

"Q. Was he also asked if he understood that he was not to pick out anyone unless he felt that person was the robber, so forth? A. Yes, he was.

"Q. Okay. Now, following that, on the same day, did you go over and obtain a robbery complaint against Mr. Ledesma? A. Yes, I did.

"Q. And was an arrest warrant sought also in connection with that robbery complaint? A. Yes."

Although no express testimony was elicited or given, the crucial importance of the identification to the robbery count—and implicitly to the other counts as well—was made clear in the following colloquy between the prosecutor and Sergeant Traskowski.

"Q. ( BY MR. KENNEDY ) Now, was this a one-witness robbery case that you were investigating at that time? A. Yes, it was.

"Q. And by that, does it mean that the victim is the one witness to the case? A. Yes. He's the only one that saw anything that we were aware of.

"Q. When you have a case such as that, a one-victim robbery case, what happens to the case when the witness dies or is missing in some other way? A. You can—it can be an impossible case to prosecute."

Officers Webster and Guerra described their participation in the investigation into the August 1978 robbery and the consequent warrantless entry into defendant's apartment and the interception of the telephone call. Before she related the statement defendant allegedly made over the telephone, Guerra added that the officers were "invited in." Parrish neither raised any

objection to Guerra's testimony nor attempted to undermine it on cross-examination.

The prosecution called one Sylvia Ontiveros to testify to certain admissions defendant had allegedly made. When questioned on the matter on direct examination, however, Ontiveros stated that although she had heard several people—none of whom she could identify—say defendant had been involved in the crimes charged, she had never heard defendant himself make any admission or at least could not clearly remember whether he had. She admitted that on being informed by the police that her husband, Santiago ("Jimmy") Ontiveros, was a suspect in the crimes she had stated that defendant made admissions of involvement. She further admitted that she had so testified at the preliminary hearing. Nevertheless, she continued to insist that she could not clearly remember whether defendant had made any admission. At the beginning of direct examination she stated that she was afraid to testify, and at the end declared she gave the testimony she had given in an effort "not to hurt myself."

The prosecution next called one Michael Shay. Shay testified that he met defendant, who introduced himself as "Jose," at a party at the Cobble Square Apartments in Salt Lake City in March 1979. Two days later he again saw defendant at the same complex and spoke with him for ten or fifteen minutes. During their conversation, he said, defendant made the following admissions: he was from San Jose and was wanted for a robbery at a gas station; at the time of the robbery he had put a gun in the attendant's face and said if he "narced"—i.e., informed—on him he would come back and "snuff"—i.e., kill—him; he went back to the station and as the attendant was placing a case of oil in his trunk pushed him in and shut it; he then took the attendant to the mountains and unloaded a gun into him; he killed the attendant because he had "narced" on him. After the conversation, Shay said, he left and never saw defendant again.

The prosecution then called one Floyd Cowdell. Cowdell testified that he met defendant, who identified himself as "Joe Salinas," around September 1978. Two or three weeks later, defendant moved in with him and his wife Sharla and stayed two or three months. While he was there he made the following admissions: he moved to Salt Lake City because he was in trouble in California and was being sought under a murder warrant; he and a friend had committed a robbery at a gasoline station; he was riding a motorcycle; he had forgotten to wear a mask and the victim saw him; because he did not want to get caught, he returned with two or three others, took the victim in a black van to some bushy place or some mountains, and shot and stabbed him.

The prosecution next called Sharla Cowdell, whose testimony differed in some respects from her husband's. She stated that she met defendant, who identified himself as "Joe Salinas," around August 1978. Not long afterwards he moved in, and stayed about three months. During his time there, he made the following admissions to her and Floyd: he and a friend committed a robbery at a gasoline station; he had ridden in on a motorcycle and had forgotten to pull down his mask; after the robbery he and his friend went to another friend's house and were told the police were looking for them; he and some of his friends went back to the station, and took the attendant to the mountains; there he shot him a few times, told his partner to stab him, and when the partner refused, stabbed the attendant in the chest. When defendant finished his tale, Sharla testified, he told them he would kill them if they informed on him.

The prosecutor introduced several photographs which graphically depicted the victim's body and the wounds it bore, some having been taken at the crime scene and the rest at an autopsy. Parrish did not object to the admission of any of the photographs, and in fact twice stated that he had no objection to the introduction of the autopsy photographs.

Taking the stand in his own defense, defendant gave in substance the following testimony. On August 26, 1978, he got up around 11 a.m. and gave a friend who had stayed the night a ride home on his motorcycle. He spent some time talking at the friend's home and then went to visit two friends whom he knew only as "George" and "Joel." He arrived at their apartment about 3 or 3:30 p.m. and found them present with a man and woman whose names he did not know; they drank and smoked marijuana. About 4:30 p.m. he went across the street, bought some beer, and returned; they continued to drink but started to run low on marijuana. George and Joel decided to get some "joints" of phencyclidine (PCP). Since their car was out of gas and they had no money, he let them use his motorcycle; he gave the keys to George, and watched them leave with George driving; they said they would be back in about an hour. He then started to drink some more beer.

Between 5:30 and 5:45 p.m., defendant continued, George and Joel returned with some "joints" of PCP which they had purchased for $20 apiece. The group drank and smoked, laughed and talked. George then told them that he and Joel had just pulled an armed robbery at the Hudson gasoline station and flashed some bills. George and Joel said in substance that they had done the job quickly and had not covered the motorcycle's license plate or disguised themselves. About 6 or 7 p.m. defendant called his former girlfriend, Leticia Mejia, at whose address his car and motorcycle were registered, and asked whether anyone had been looking for him; she told

him that the police had just been there attempting to find him and said he had pulled an armed robbery. He became very angry at George and Joel, who he knew had been in prison and had committed robberies before. They told him not to worry and suggested that he stay at the apartment "until the heat's off." He decided to act on their suggestion—Mejia having told him that she had given the police his address. He did not call his apartment as Officer Guerra had testified. He thought about turning himself in and telling the police about George and Joel, but decided not to because he feared he would be labeled a "snitch."

He remained at the apartment two or three weeks, defendant went on, never leaving it out of fear he might be arrested. Finally, he took a bus to Salt Lake City. There he was met by a cousin. He told her he was wanted for armed robbery but had not committed the crime. He stayed with her between one and two months and then moved in with the Cowdells, whom he had met through another cousin. One day Floyd told him he had just pulled a robbery, and indeed bragged about all the robberies he had been committing. In response defendant said, "Why don't you be cool, man. Don't bring any more heat because they're looking for me, you know, for armed robbery." Although he told them he was wanted, he did not describe the incident. They expressed no concern that he was being sought: the police were always coming to the Cowdell's home to serve warrants on Floyd.

While in Utah, defendant continued, he called his brothers and Jimmy Ontiveros and learned that the gasoline station attendant had been murdered and that he was wanted in connection with the crime. He never discussed the murder with the Cowdells, and assumed they must have learned about it from the police in the course of striking some deal. Nor did he tell Shay that he had committed a robbery or a murder: Shay was "just another pusher—another clown," and defendant did not like him; a couple of days before he left Utah, Shay was arrested on drug charges. He did not discuss the crimes with Sylvia Ontiveros when he called Jimmy. Sylvia was "burned out" on PCP and had a poor memory. After she testified to his alleged admissions at the preliminary hearing, she told some of his friends she was forced to do so to prevent robbery and murder charges from being brought against Jimmy.

Defendant denied ever owning a gun. He also denied that he had ever committed an armed robbery or a murder. Indeed, he asserted that he had been in trouble with the law only once, when he was committed to the California Youth Authority as a result of the theft of an automobile. It was undisputed that he had never suffered a felony conviction.

On cross-examination the prosecutor elicited from defendant testimony to the effect that the police reports revealed that the victim had identified him

as the robber and that several anonymous callers had told the police that he had committed the August 1978 robbery and the murder. The prosecutor also questioned defendant extensively about his juvenile record and his participation in unproven crimes other than those for which he was on trial. Further, he examined defendant as to a conversation surreptitiously tape-recorded in jail, in which he stated he knew who informed on him and would get his revenge. The prosecutor also elicited from defendant his explanation of the testimony against him—to the effect that under the direction of Sergeant Kenneth Kahn of the Santa Clara Sheriff's Department, who was in charge of the murder investigation, the authorities and Sylvia Ontiveros, Shay, and the Cowdells conspired to engineer a "frame up." On each of these matters, as on others, Parrish made no substantial objection.

Rudy Ledesma, one of defendant's older brothers, also testified on behalf of the defense. He stated, inter alia, that George and Joel were indeed real persons, and that it was he who had introduced defendant to them.

On rebuttal the prosecutor called three witnesses. Sergeant Kahn described the conduct of the murder investigation and denied the existence of a "frame up." In the course of cross-examination, Parrish stated that he himself did not believe Kahn had participated in "framing" defendant. Deputy Jay Labrum of the Salt Lake County Sheriff's Department testified as follows: as he was seeking a person known as "Jose Salinas" and before he had learned of the California crimes, he went to the Cobble Square Apartments and showed defendant's photograph to several persons including Shay; Shay said that the subject had admitted a California armed robbery and murder; he did not supply information to Shay and did not bargain with him. Sergeant John Bernardo of the same department gave the following testimony: as he was seeking a person known as "Jose Salinas" and before he had learned of the California crimes, he interviewed the Cowdells; Sharla told him defendant admitted killing a man in California and Floyd said the same thing; he had made no threats or promises to obtain the Cowdells' statements and denied he had "cook[ed] anything up" with the California police.

In closing argument the prosecutor summed up his case and, without objection by Parrish, emphasized the critical importance of the victim's identification of defendant, the telephone call intercepted by Officer Guerra, and defendant's alleged admissions. In his argument Parrish maintained that the prosecutor had failed to carry his burden, but again made it clear that he himself did not believe in defendant's "frame-up" theory: "I don't think that the police framed my man, that there's some sort of a cheap, as I say, theatrical maneuver on their part to gather evidence through statements of people who are either somehow persuaded through threats or perjury or threats to commit perjury or whatever way they are persuaded."

Of the 54 instructions given at the guilt phase all were requested by the prosecutor. They included CALJIC No. 2.52 (1979 rev.), on flight after the commission of a crime; a modification of CALJIC No. 8.21, on first degree felony-murder robbery; and a modification of CALJIC No. 8.84.2 (1977 rev.), on the special circumstance of murder in the commission of a kidnapping. To none of the instructions given did Parrish make any objection, nor did he request any instructions himself.

During their deliberations the jury made several requests for the rereading of testimony. The first such request was for the portion of Sergeant Traskowski's testimony "re: positive I.D., i.e., I.D. of Ledesma." Because Traskowski had never given such testimony, the court responded to the request as follows: "In connection with Officer Traskowski and the identification of the photographs shown. The transcript does not show that he was asked a direct question. That being a hearsay situation, the district attorney proceeded in the manner that the reporter will read to you." After almost 15½ hours spent in deliberations over 3 court days, the jury returned a verdict finding that defendant was guilty as charged and that all the special circumstance allegations were true.

At the beginning of the penalty phase the prosecutor and Parrish stipulated on the record that "during the course of these proceedings the jury shall consider all of the evidence which has been received during the first part of the trial." Without any objection by Parrish the court then preinstructed the jury, pursuant to former CALJIC No. 8.84.1, on the sentencing factors defined in former Penal Code section 190.3. Neither the prosecutor nor Parrish presented an opening statement.

The prosecutor called a number of witnesses to establish that defendant had committed three armed robberies in Salt Lake City early in 1979. He also called Sergeant Lawrence Demkowski of the San Jose Police Department, who testified that when defendant was sixteen years old he was classified as a runaway juvenile and had burglarized the home of one of his brothers, stole a handgun, attempted an armed robbery with two other youths, and afterwards stole a car.

Parrish called four witnesses, each of whom gave brief testimony. Sergeant Kahn stated in substance that prior to trial defendant made an effort to help the police in their search for the other persons who they believed participated in the murder.[1] Annalita Ledesma, defendant's former wife,

---

[1] On cross-examination the prosecutor elicited from Kahn testimony to the effect that when he told defendant the Utah authorities had filed three formal charges of armed robbery, defendant responded, "Only three?" and volunteered that he had been responsible for twenty-eight such crimes. On redirect examination Parrish asked, "And as to the figure, I'm not sure, you indicated twenty-eight or thirty-six, are those figures off the top of your head? Or do you recall actually how many he indicated he had done?" Kahn responded, "Twenty-eight is the figure that I recall."

testified that during the time they lived together defendant worked and was a good husband, and that he had always been a good father to their three daughters, had never shown violence, and to her knowledge had never been involved in serious criminal activity. Pasqual Ledesma, one of defendant's older brothers, testified that to his knowledge defendant had always gotten his money from honest work and had never committed an armed robbery, and that he had never seen him violent or armed. Without objection by Parrish, on cross-examination the prosecutor attempted, with some success, to elicit testimony from Pasqual to the effect that defendant was declared an uncontrollable juvenile, had been committed to the California Youth Authority, had stolen cars, had been put in jail on various occasions, and had been in and out of trouble all his life. Reuben Gomez, defendant's best friend, testified that although he was aware that defendant had problems as a juvenile, he never knew him to be involved in armed robberies or violence of any kind, to be arrested, or to carry a weapon.

In closing argument the prosecutor maintained that the statutory sentencing factors, applied to the facts of this case, required the imposition of the death penalty. In a brief argument which fills less than three and one-half pages of transcript, Parrish essentially made what was not so much a plea for defendant as a general attack on capital punishment and asked that the jury impose life imprisonment without possibility of parole.

With two exceptions, all the instructions given at the penalty phase were requested by the prosecution, and included former CALJIC No. 8.84.1. The exceptions were CALJIC No. 2.60 (1979 rev.) as modified, to the effect that no adverse inference may be drawn from defendant's failure to testify, and CALJIC No. 2.61 (1979 rev.) as modified, to the effect that defendant may rely on the state of the evidence. In asking for these instructions, Parrish submitted form requests which he had obtained from the prosecutor's office. He made no objection to any of the instructions requested or given, and indeed made no objection at all during the entire penalty phase.

During deliberations the jury may have come close to deadlock: on the second day they asked the court, "What are the options under the circumstances of the jury not being unanimous?" On the third day, however, and after almost 10½ hours of deliberation, they returned a verdict of death.

At the automatic verdict-modification hearing Parrish filed in open court the first and only written motion that he had himself prepared and the only written motion made on behalf of defendant since the request for the appointment of Dr. Glathe, which had been drafted by defendant's original public defender counsel. The motion, which sought a "new trial . . . [or]

modification of punishment," rested on conclusory assertions of judicial error, prosecutorial misconduct, and lack of support for the jury's verdicts and findings.

The verdict-modification issue was evidently close. The following colloquy took place between the court and the prosecutor:

"THE COURT: Mr. Kennedy, let me ask you, what is there in this case that connects the defendant to any of these crimes other than his own statements that were testified to [by] other persons? MR. KENNEDY: Well, the statements are the main things, of course. . . .

"THE COURT: Well, it's true, isn't it, that the only physical evidence that you were able to present was the license number of the motorcycle belonging to the defendant? MR. KENNEDY: Yes. . . .

"THE COURT: No gun was ever found, no knife was ever found, no tapestry. MR. KENNEDY: That's correct."

After this colloquy the court made a statement which runs in relevant part as follows:

"What has bothered me about this case and throughout was the nature, the quality, and the quantity of the evidence relative to the defendant's participation in the crimes charged. There is no question about the evidence missing. There can be no doubt that there was a murder committed. The criminal agency was involved.

"I do believe that the main difficulty with the case is the question of what weight is to be given to the defendant's statements if believed to other persons. Which brings me to the automatic review required by the law, and that the court conduct in a case in which the jury has returned a death penalty. I start that review from the point of view . . . that judges should be willing to uphold the jury's verdicts in all instances where that is possible. But in this circumstance, the weight placed upon the court is not as narrow as it is under the present law.

"That is to say, under the 1977 law in which the court is bound to decide the automatic review. It seems to me the court is required to reweigh or entitled to reweigh the weight of the evidence in support of the conviction and the penalty.

". . . . . . . . . . . . . . . . . . . . . .

"But the whole issue in my mind comes down to the question of what weight in reviewing the case the court is to give to the testimony of those who testify as to statements made by the defendant to them. I believe a case of this nature as to the crimes here committed, the death penalty is a proper penalty.

"And from the beginning when the jury had reached their verdict, I was aware of the fact that ultimately I was going to have to decide the same issues that they decided and have the responsibility of an independent determination in that regard. The law is that oral statements of the defendant are to be viewed with caution. And that doesn't make any distinction as to who they're made to or when they're made or even the circumstances under which they're made. So it becomes critical in this case, I believe, as to those witnesses who testified, as to what the defendant allegedly told them.

"Mrs. Ontiveros who testified in part left me with the impression that her testimony—well, first of all, what she said in my mind was not sufficient to uphold either a verdict in any regard, but hers was not the only testimony. But I got the distinct impression from her testimony that she was attempting to hold back. That she was not being totally frank with the court or the jury. And I further would hesitate to give the weight to her testimony that would impose the death penalty on anyone.

"The young man from Utah was a different situation. He had no connection whatsoever with the defendant before the offense here in question. And indeed, it was rather a casual connection with the defendant there in Utah. And for a rather brief period of time.

"And the defendant, in his testimony, struck me as the type of person who would brag, the type of a person who would discuss things that he had done in a sense of attempting to be [an] enlarged image in somebody else's view. And in that brief encounter and statements, if that were the only evidence I'd be hesitant to uphold the jury's verdict as far as the death penalty is concerned.

"But that's not the only statements. There is the statement of the people who the defendant lived with in Utah for a period of time. . . .

"But the Cowdells' testimony, I think, is the most damaging part of the district attorney's case to the defendant. That is, quite frankly, if it was Mr. Cowdell's testimony, he alone, I would be hesitant to uphold the jury's verdict as far as the death penalty is concerned.

"But Mrs. Cowdell's testimony was direct and concise. And watching her on the witness stand, her demeanor, and even viewing what she said with

caution, left me with the belief that the defendant had confessed the crime to her. . . .

"And although I'm aware that there is no other physical evidence which connects the defendant to the crimes, and that has been a concern from the beginning of this case in my mind, I do believe the defendant committed the crimes as charged. I do believe the evidence supports that finding. . . .

"In reviewing the aggravating and mitigating circumstances, I think the use of drugs and marijuana by the defendant is a mitigating circumstance. I think the fact that he had no—that he had never been convicted of any felony, indeed his criminal record prior to the events here in question was rather minimal. The aggravating circumstances far outweigh, in my mind, those mitigating circumstances."

Accordingly, the court declined to modify the jury's verdicts and findings and denied Parrish's motion. Thereupon, it pronounced judgment and sentenced defendant to death.

### III. THE HABEAS CORPUS PROCEEDING

Claiming that Parrish failed to provide him with the effective assistance of counsel—i.e., that he failed to perform his duties with reasonable competence and as a result prejudiced the defense—defendant filed in this court a petition for a writ of habeas corpus.

In support of his claim he made numerous specific allegations, most of which fall into one or more of the following general categories: (1) Parrish failed to adequately investigate the facts of the case or research the applicable law, especially with regard to the availability of the defense of diminished capacity; (2) Parrish failed to make use of the evidence and leads contained in a report assembled by defendant's original public defender counsel, which included a psychosocial report prepared by one Marynella Woods and a general investigative report prepared by one Russ Kuebel; (3) Parrish made misrepresentations to defendant to the effect that he could guarantee acquittal on the basis of insufficient evidence; (4) Parrish failed to attempt to bar reference to the victim's extrajudicial identification of defendant; (5) Parrish failed to attempt to bar reference to the telephone call intercepted by Officer Guerra; (6) Parrish failed to attempt to bar reference to the anonymous telephone calls informing the police that defendant was the perpetrator of the crimes charged; (7) Parrish failed to undertake an investigation of Sylvia Ontiveros, Shay, and the Cowdells, and specifically failed to make any effort to determine whether he had obtained through discovery all the material to which he was entitled relating to Shay and the

Cowdells; (8) Parrish failed to make any effort to test the testimonial competence of Sylvia Ontiveros and Sharla Cowdell; (9) Parrish failed to attempt to bar reference to defendant's juvenile record and his alleged participation in certain unproved crimes; (10) Parrish failed to object to the prosecutor's alleged use of peremptory challenges to strike Hispanics from the jury on the ground of group bias alone in violation of *People* v. *Wheeler, supra,* 22 Cal.3d 258, failed to object to the excusal for cause of two jurors allegedly in violation of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S. Ct. 1770], and failed to perform with reasonable competence in certain other regards during jury selection; (11) Parrish failed to present a defense of diminished capacity at the guilt phase; (12) Parrish failed to perform with reasonable competence in certain other regards during the guilt phase; (13) Parrish failed to present evidence of defendant's use of drugs in mitigation at the penalty phase; (14) Parrish failed to request any instructions at the penalty phase other than CALJIC Nos. 2.60 (1979 rev.) and 2.61 (1979 rev.); (15) Parrish failed to perform with reasonable competence in certain other regards during the penalty phase; and (16) Parrish failed to communicate with defendant after sentence was imposed or to cooperate in any manner with defendant's appellate counsel, Robert R. Bryan.

Concluding that the petition established a prima facie case for relief, we issued an order to show cause and subsequently appointed Judge Joseph P. Kelly to take evidence and to make findings and conclusions responsive to the questions that appear in the margin.[2]

---

[2]1. What evidence or leads, if any, were contained in the report offered to petitioner's trial counsel by his former public defender counsel?

2. What steps did petitioner's trial counsel take to investigate this case?

3. What evidence, if any, did petitioner's trial counsel discover in his investigation of this case?

4. What evidence or leads contained in the above-mentioned report were not discovered by petitioner's trial counsel in his own investigation?

5. Did petitioner's trial counsel inadequately represent him (i.e., did counsel fail to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate), either

(a) by failing to diligently investigate petitioner's case before trial and seek out witnesses on his behalf?

(b) by failing to review former public defender counsel's report?

(c) by failing to object at trial to introduction of out-of-court statements by unnamed persons who identified petitioner as the robber and murderer?

(d) by failing to object at trial to introduction of a telephone conversation during which petitioner allegedly made admissions to a police officer? or

(e) by reason of any other allegations made in the petition for writ of habeas corpus?

6. If any of the subparts of question 5 is answered in the affirmative, (1) did trial counsel's failure to act deprive petitioner of a potentially meritorious defense (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]), or (2) is it reasonably probable that a determination more favorable to petitioner would have resulted in the absence of counsel's failings (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144])?

The reference hearing opened on December 3, 1984, and closed some nine months later. Before the referee by stipulation of the parties were the record of the trial and the parties' appellate briefs. The record of the evidence and argument presented at the hearing fills 30 volumes and exceeds 4,300 pages.[3] The tale the report tells is as follows.

Certain critical facts emerge as either essentially undisputed or at least clearly established. To begin with, Parrish failed to undertake any research into the law and procedures applicable to capital cases. He failed to do so even though this was his first such case.

Further, Parrish neither conducted nor—despite the availability of Penal Code section 987.9 investigation funds—did he retain anyone to conduct a full and independent investigation into the facts of the case. Indeed, he made virtually no investigation at all.

The substance of Parrish's preparation for trial was as follows. First, he apparently read the transcript of the preliminary hearing. Second, he reviewed police reports, tape recordings, and other materials which the prosecution produced under a standing discovery order. In the transcript and the discovery materials he was presented with the facts, issues, and potential witnesses crucial to the prosecution's case, and also with such other matters as the existence of evidence implicating defendant in crimes other than those charged. Third, although contrary to his testimony he evidently never met with Deputy Public Defender Johnson to discuss the case, he somehow obtained and later reviewed portions of the public defender's report. This material included the Woods psychosocial report and part of the Kuebel report, which contained generally (1) the results of a preliminary factual investigation, including information about possible criminal activity on the part of Shay and about the "bad reputation" of the Cobble Square Apartments, and (2) suggestions on what should be done to complete the investigation. Fourth, Parrish interviewed defendant and learned of his troubled life, including his juvenile record and contacts with the law and especially his long and serious abuse of such drugs as PCP and methamphetamine. He also learned of defendant's version of the facts of the case, including drug abuse and criminal activity on the part of Sylvia Ontiveros, Shay, and the Cowdells. Fifth, Parrish sought the appointment of Dr. Glathe and obtained his report. Sixth, he asked Rudy Ledesma to attempt to locate a potential defense witness; Rudy, however, was without the time and the training necessary and did not locate the witness—nor did anyone else.

---

[3] By contrast, the trial, including jury selection, was conducted in 20 court days and the record runs to only 1,500 pages.

Parrish did not follow up on any of the information detailed above nor did he attempt to obtain further information. Specifically, he did not pursue any further investigation into defendant's mental state at the time of the crimes charged.

Also, with the exception of the motion to appoint Dr. Glathe, Parrish made no pretrial motions, either to limit the prosecutor's evidence or for any other purposes. During jury selection he made no objections and was in large part essentially passive. At trial he did practically nothing to limit the prosecutor's comments and questions, did not protect his witnesses or engage in extensive cross-examination of the prosecutor's witnesses, and was otherwise in large part essentially passive.

At the habeas corpus hearing defendant presented considerable evidence concerning such matters as his troubled childhood, adolescence, and young adulthood, including the severe abuse he suffered at the hands of his father and his long and heavy use of PCP, methamphetamine, LSD, and other substances. He established beyond dispute that information bearing on these matters was within Parrish's possession at and before the time of trial. For example, Parrish, as he himself admitted, had the reports of Woods[4] and Dr. Glathe.[5] Defendant similarly established that further information was readily available. Several relatives and friends testified from personal knowledge that as a child and adolescent defendant had frequently been

---

[4] The Woods report appears in its entirety in Appendix A, *Post,* page 246.

[5] Dr. Glathe's report states in its entirety: "I examined your client Fermin Ledesma, SC No. 72102 in the San Mateo County Jail on October 27, 1979 pursuant to Section 1017 of the Evidence Code. Mr. Ledesma is a 28 year old divorced unemployed termite repairman. He was married for 8 years and has 3 children by his now terminated marriage. He has been in jail since the 16th of March, 1979. As you know the details of the police report and other information I will not detail them again here. I will limit myself to my mental status examination and my diagnostic conclusions. If there is further information that you wish please let me know.

"At the time of my examination Mr. Ledesma was pleasant, cooperative and alert. He knew why I was there and cooperated to the fullest. He was oriented as to time, place and person. His associations were intact. There was no evidence of any thinking disorder. There was a certain softness in his speech and demeanor. There was also a certain 'macho' aspect to his affect which I felt was a little inappropriate in view of the serious charges he faces. His intelligence seemed average. He had a good grasp of present events. He felt that he could cooperate in the upcoming legal proceedings with you and felt that he could withstand the rigors of a trial. He did seem to appreciate intellectually the situation in which he finds himself.

"I found no serious mental illness present at this time. In view of his past drug usage the most important diagnosis I can make at this time would be that of drug dependence, principally PCP and methamphetamine. I rather suspect that there have been times when he has seriously abused and overused these substances as well as other substances. I feel that he is presently competent to stand trial pursuant to section 1368 and I feel that he probably was sane pursuant to Section 1026 of the Penal Code.

"I hope this report will be of help to you and if there is any more information I can furnish you with, please let me know."

beaten by his father, that early in his teenage years he began his lifelong abuse of drugs, and that in the summer of 1978 he was heavily using PCP and appeared out of touch with reality. These witnesses made it clear that they would have testified on defendant's behalf at trial, but that they were not contacted by Parrish. Woods testified that she offered to meet with Parrish in order to provide him with whatever assistance she could, but that Parrish did not respond to her offer.

Called by defendant to explain his performance as counsel, Parrish gave extensive testimony. He described his background—he had practiced law since 1962—and explained his entrance into the case. In the summer of 1979 defendant's family approached him to serve as counsel—defendant being dissatisfied with his then counsel, Deputy Public Defender Johnson, and with Johnson's efforts to negotiate a plea. Although he had fairly extensive trial experience, he had never tried a capital case. Nevertheless, he offered to represent defendant for a fee of $15,000; defendant's family was unable to afford that amount; he reduced his fee to $5,000, and the family retained him, made a $1,000 downpayment, and, he alleged, never paid him the rest.

Defendant, Parrish continued, was an open, candid, and cooperative client. In their discussions, he alleged, defendant made a detailed but flat and emotionless confession—an allegation vigorously denied by defendant. It was in part because of defendant's history of drug abuse and in part because of the tone of his alleged confession that Parrish sought the appointment of Dr. Glathe.

Although it was clearly established that Parrish had somehow obtained some portions of the public defender's report, it was difficult to determine precisely which portions. At the hearing Parrish was shown each page of the report, questioned whether he had obtained and reviewed it, and responded "yes," "no," or "maybe." The reason for this procedure was as follows. Parrish stated he was unable to refer to or produce his copy because he no longer had it in his possession. He explained that in the winter of 1980-1981, his entire Ledesma files, which included these materials, documents and audiotapes produced by the prosecution, and other items, were stored in a cardboard box in a storage area at his condominium complex; the winter rains were heavy, the storage area leaked, and the files became water-soaked; he dried the contents as best he could, but in time they became moldy; in the late autumn of 1983, he discarded the files in a public dump. He admitted that at the time of disposal he knew not all the documents had been rendered illegible and did not know whether any of the tapes had been affected. He further admitted that he knew this appeal was

pending and, indeed, had been requested by appellate counsel to make the files available.

Although Parrish's testimony on the choice and preparation of a defense is not without ambiguities and inconsistencies, the following story emerges: by the time Parrish entered the case, defendant had begun to prepare an alibi defense; Parrish discussed the defense with him and agreed to assist in its development; although prior to trial he stated in response to the court's question that he had considered a diminished capacity defense but had decided not to use it, at the hearing he admitted that he did not seriously consider such a defense—which in fact he had never presented during his career—and could not remember discussing it with defendant; in passing over the diminished capacity defense he was apparently influenced by the detailed nature of defendant's alleged confession, defendant's seeming rationality, the substance of Dr. Glathe's report, and his personal belief that a person's use of drugs or alcohol does not affect his criminal responsibility.

In the earlier part of his testimony Parrish defended his performance, asserting in essence that he had not done more because no more was needed. For example, as to his failure to undertake a full and independent investigation, he claimed in substance that the items and information he had obtained were sufficient to enable him to prepare for trial. On his failure to attempt to bar reference to the victim's extrajudicial identification of defendant, he stated in effect that the prosecutor had conceded that the evidence was inadmissible hearsay and agreed not to introduce it, and that as a result he thought such an attempt unnecessary. As to his virtual passivity at trial, he said in essence that more active representation might have alienated the jury.

In the midst of his testimony, however, Parrish suddenly manifested a change of heart and began telling a very different story. He admitted in effect that he had violated not only his duty to act with reasonable competence but also his duty of loyalty: during the period he represented defendant he was gambling compulsively and as a result directed his energy and attention to his compulsion and not to the defense of his client.

For example, at one point Parrish stated: "My time was not being fully devoted to my profession." At another: "I was really married to this thing [viz., gambling] and that's the truth." And at yet another: "My gambling, it was important, the most important thing in my life, not my practice, not my defense of Fermin, not anything else." Specifically, he stated that before and during trial he was gambling heavily, and may have gambled until 2 or 3 a.m. three or four times during the work week and three days straight over a weekend without sleeping, and that as a consequence he was not

mentally alert. He added that as a result of his gambling he was about $35,000 in debt. He admitted that he should and—but for his compulsive gambling—would have undertaken a thorough factual investigation, and that he should and would have attempted to bar or counter reference to, for example, the intercepted telephone call, the victim's extrajudicial identification of defendant, the anonymous telephone calls identifying defendant as the perpetrator, and defendant's alleged admissions. He also admitted that he had virtually conceded the penalty phase, and that at the very least he should have presented in mitigation the evidence of defendant's history of drug abuse.

Parrish's testimony about his compulsive gambling was supported by witnesses David Cole and Randy Nelson. Cole stated that during the period relevant here he socialized with Parrish and witnessed his compulsive gambling. He added that he also saw Parrish "snort" large quantities of methamphetamine or, to use its street name, "crank"—about $1,500 to $2,000 worth a month. By the time of the hearing Cole had a falling out with Parrish and was on parole after serving a prison sentence. Nelson stated that he too had socialized with Parrish and witnessed him gambling compulsively. He added that he also saw him drinking heavily and using large amounts of "crank" and some cocaine. He said that once in 1976 or 1977 he, Parrish, and a third person smoked PCP and that on that occasion Parrish attempted to call the Vatican but without success. He stated that although he stopped socializing with Parrish on a regular basis sometime in 1979 in order to straighten out his own life, he continued to see him until he moved out of state in 1983 and still considered him his friend. Expert testimony was given to the effect that the use of drugs such as "crank" and cocaine impairs "brain function . . . and ability to respond to something new or a crisis, or to participate in more abstract, complicated thinking." Parrish denied he used drugs at the time he was representing defendant.

In order to establish that Parrish failed to act with reasonable competence and as a result prejudiced the defense, defendant called several experts. The testimony of five of them is particularly relevant here.

Fred Rosenthal, M.D., a psychiatrist, was of the opinion that when, as here, there is evidence that a defendant has long and seriously abused PCP, a defense of diminished capacity is generally available and may indeed be meritorious, and therefore should be investigated. He testified that PCP is a highly destructive and mind-altering drug: "It produces almost every psychological, psychiatric symptom you can name. . . . [¶] And it goes all the way to producing the most serious psychiatric condition, which is psychosis. It can produce a complete break with reality. . . . [¶] In addition to the psychiatric problems, PCP can produce neurological problems. . . . [¶]

[Users] can have intellectual defects. They can have problems with memory. . . . [¶] In addition to that, PCP seems to have a property that some drugs don't have. And that is it can produce chronic effects which extend beyond the time that the drug is taken."

Dr. Rosenthal further testified that in order to determine the effects of PCP on a criminal defendant and thereby assemble data to be used in evaluating the availability of a diminished capacity defense, the defendant should be subjected to extensive psychiatric, neurological, and physical examinations, and his family, friends, and acquaintances should be interviewed to verify the information he furnishes. Independent verification is required not only because the defendant may have an interest in not telling the truth, but also because his memory may have been weakened or destroyed by use of PCP and his mind may have restructured from various materials a version of the relevant events that corresponds little, if at all, with what actually happened.

Dr. Rosenthal was of the opinion that Dr. Glathe's report did not furnish a sufficient basis for rejecting a defense of diminished capacity. He stated: "I don't think that he does anything really about addressing the issue of the mental condition at the time of the crime, except to make a rather vague statement at the end of the report." He also said: "I don't think that really, in my opinion, this report does not really address that question. It seems to be concerned more with whether the man is mentally competent to stand trial at the time that this evaluation was done . . . ." He emphasized that defendant's mental state as he faced trial in 1979 and his mental state at the time of the crimes charged were separate matters. He concluded: "I would say that it is not a particularly adequate, complete report. Even as far as the question of competence goes."

Dr. Rosenthal added that far from justifying the rejection of a diminished capacity defense, Dr. Glathe's report contained information suggesting that further work be undertaken: "And so I think, given that there was drug abuse, and dependence on [PCP and methamphetamine], certainly that would raise a flag, a red flag that something needed to be looked at."

Turning to the question of the strength of a diminished capacity defense in defendant's case, Dr. Rosenthal stated: "I think that given the history and the amount of drugs that Mr. Ledesma took, it would be almost inconceivable to me that he would be in the normal state of mind during that period of time. [¶] Nobody taking the amount of drugs that he took could maintain a normal, rational, calm state of mind with that kind of drug abuse." In response to appellate counsel's question, "In your opinion, is it possible, probable, that with this amount of drugs, that he was in a state of

diminished capacity at the time of the crimes?," Dr. Rosenthal answered, "I would think that that would be a reasonable consideration."

David E. Smith, M.D., a leading specialist in toxicology and addiction and the founder and medical director of the Haight-Ashbury Free Medical Clinic, testified to the various adverse toxic reactions that PCP can produce: "The type one adverse toxic reaction is characterized by the four C's: Catatonia, combativeness, convulsion and coma . . . . [¶] The individual that has the type one acute toxic reaction . . . will have this mind-body disassociative effect where they can have very, very severe impaired judgment, lowered impulse control, impaired memory. [¶] It can have—a lot of violence can occur during this type of type one reaction, particularly when it's mixed with other drugs such as alcohol.

"Type two reaction is more a chronic abuse pattern. . . . [¶] In this type of chronic PCP abuse reaction, the individual can be delusional with severe impaired judgment. One will see varying impact on memory. There is severe impairment of memory, cognitive functioning, judgment and reason with PCP. . . . [¶] With PCP, there tends to be a lot of impairment of memory, time distortion. You tend to have gray-outs, flickering memories, where you will remember this event and then you'll remember another event, but the time period between the two will be distorted. [¶] . . . . So that there is substantial impact on memory, but in this context individuals that have these types of grayouts very often will resort to secondary techniques to try to reconstruct, talking to people in their environment, to try to figure out what happened during that gap. So you have primary memory and secondary memory. [¶] There is an increased incidence of violence, particularly bizarre, irrational violence with both type one and type two adverse PCP reactions.

"The third type of reaction with PCP is a PCP precipitated schizophrenic reaction, where the individual has pre-existing psychopathology, particularly of a thought disorder type, such as schizophrenia, and will take a single dose of PCP and have a very prolonged schizophrenic reaction.

". . . . . . . . . . . . . . . . .

"The type four reaction would be PCP withdrawal, which is characterized by cognitive impairment, depression, things of this nature."

Dr. Smith developed his testimony on reconstruction and secondary memory: "Our experience in dealing with hundreds of PCP abusers and polydrug abusers over the years is that they try to reconstruct what happened, because the mind doesn't like to not know what happened in particular

times. [¶] So, for example, they may not remember where their car is, they find their car, they can't remember how it got there, so they go around and obtain information from others as to how their car got from point A to point B, when they can't remember the in between time, we'll call the secondary memory. [¶] Primary memory is what you actually remember yourself. Secondary memory is what you reconstruct using the external bits of information."

Finally, in response to appellate counsel's question, "What effect, if any, just generally, can the chronic use of PCP have upon intent in this area of diminished capacity?" Dr. Smith stated, "In my opinion, because of its effects on abstract thinking, . . . it can produce toxic psychosis, . . . it can potentially have a severe impact on mental capacity and ability to form intent."

Thomas Nolan, an attorney and a certified criminal law specialist, was of the opinion that even when a criminal defendant has made a confession, reasonably competent counsel would undertake a full and independent investigation into the facts of the case. He explained: "First of all, I don't think that merely because the person accused admits the crime, means that you should assume that the person accused committed the crime. I think the lawyer must do an independent evaluation to make sure the lawyer is satisfied that the confession that the defendant is giving you, or the admissions that are coming out, conform to reality. Whether they are accurate. [¶] There are people who confess to crimes, and there are reasons why individuals will admit to crimes they have not committed. . . .

 "Number two, assuming the person admits that he has committed the crime, then you need to determine: Can the state prove that he committed the crime independent of his admission to it.[6] In order to do that, it seems to me you have to evaluate the witnesses against the client. . . . Merely because the individual confessed or admitted to you that he committed the crime, that doesn't mean that the evidence that the prosecution intends to offer is accurate, reliable and trustworthy information . . . .

"Number three, if the individual admits that he committed the crime . . . and if you've come to the conclusion that he did commit the crime, and after you've investigated the prosecution's case and decided that the evidence they have is reliable and trustworthy and subject to very little challenge, then you have an obligation to present a defense consistent with your

---

[6] Without such proof, of course, any confession or admission is inadmissible. (E.g., *People v. Quarez* (1925) 196 Cal. 404, 409 [238 P. 363]; *People v. Manson* (1977) 71 Cal.App.3d 1, 41 [139 Cal.Rptr. 275].)

client's admission. Therefore, you must investigate what defenses are available."

In this case, Nolan went on, such an investigation would have included checking into the background of Sylvia Ontiveros, Shay, and the Cowdells with a view toward attacking their credibility on cross-examination. He testified that such an investigation was "Absolutely essential. . . . You need to talk to the prosecutors and defense lawyers that have represented them in the past. [¶] You need to get all the prior incidences they have been involved with. You need to try to interview them, interview their family, their former wives, their friends. All of that needs to be done. If you can destroy those two [sic] witnesses, then the prosecution's case gets weaker. [¶] On the other hand, if you find out that those witnesses are strong and don't have as much insensitivity, then you may have to fall back on why your client may have made the confession and approach it that way."

Nolan was also of the opinion that reasonably competent counsel would have sought a thorough evaluation of defendant's mental state at the time of the crimes charged both to determine the availability of a diminished capacity defense at the guilt phase and to prepare for the presentation of evidence and argument at the penalty phase. He testified in substance that the Woods report by itself called for such an evaluation. Dr. Glathe's report, he went on, did not make an evaluation unnecessary, but at most assured counsel that defendant was competent to stand trial.

Nolan also testified that reasonably competent counsel would have made numerous motions in this case including, for example, motions to bar reference to the intercepted telephone call, the victim's extrajudicial identification, and the anonymous telephone calls identifying defendant as the perpetrator.

In conclusion, Nolan was of the opinion that Parrish failed to provide defendant with effective assistance—i.e., he performed with less than reasonable competence and as a result prejudiced the defense.

Jack Palladino, an attorney and private investigator, supported Nolan's testimony on the necessity of a full and independent investigation. Such an investigation, he testified, has certain minimum requirements: "I believe that competent assistance of counsel, with regard to the investigation of this kind of case, would have required a three-part investigation as an absolute minimum. [¶] The first investigation would have involved an inquiry into the police reports, and that evidence which the prosecution expected to present at trial. That would include, for example, the prosecution witnesses."

He added, "certainly with regard to a defendant who gave any history, any history at all of serious drug use, I would not be willing to rely on that defendant's account of things, even an admission. Confusion, reading police reports and adopting them as his own, guilt yet to be understood by the defense counsel, seeking to take blame for acts that are not his, confused recollection, distorted realities under the use of drugs, all of these would be such that I would insist on, and a defense counsel should insist on, an independent investigation to get a firm sense of the reality out there, the actual facts, not the defendant's account, however distorted."

Palladino continued: "The second part of what you want to do now begins to look towards more positive defenses. [¶] In a case of this sort, where there are discussions of extensive and long history of drug use, where [Woods,] a social worker has found a disturbed family background and much abuse, physical abuse as a child, one of the questions that would arise in the positive defense that you begin to look towards, or in the positive evidence that the defendant might offer, is facts of diminished capacity because of the drug use or psychological state, possibly an insanity defense, and you would personally want to go through and begin to look for witnesses who could talk about the defendant's past drug use, who could talk about his past behavior, and who might in fact give very different accounts of admissions he had made to them, that might contradict or be inconsistent with some of the prosecution witnesses' own statements of admissions he supposedly made to them."

Dr. Glathe's report, Palladino went on, would not counsel against such an investigation: "The letter appears to be directed towards competence to stand trial and not his mental state previous, nor the issue of diminished capacity at all. They are raised in passing by the comments the psychiatrist makes." Indeed, Palladino continued, "This letter is in a sense a beacon suggesting that [defendant's use of PCP and methamphetamine] has to be explored. Even the hint of this would be worth exploring, but where you have a psychiatrist actually stating that he has found good reason to believe that there's longstanding past abuse, I think it has to be pursued. [¶] And in fact it argues for a defendant who was in no position to tell you not to pursue it or to give you a story that you would be willing to rely on without independently pursuing matters such as this, and an independent investigation."

"The final branch of what you would be looking at in a capital case," according to Palladino, "is that you would have to say to yourself, despite all the best defense you could do, we may end up finally at the penalty phase of this case. And in doing the investigation, you would constantly keep in mind the possibility of issues that could play a role in the penalty side of

the case, that could mitigate or go to the jury finding for life instead of death with regard to the penalty. . . . [¶] The way you would go about those is that, in the course of your other examination and your other investigation, you would want to make sure that you talked to every wife that he had, all his relatives, you would want to look at things like the Youth Authority Report if he's committed—if he was in the army, as I believe this defendant was, you would want to see his army reports . . . ."

Like Nolan, Palladino was of the opinion that Parrish failed to provide defendant with effective assistance.

Guyton N. Jinkerson, an attorney and a certified criminal law specialist with extensive experience in homicide trials, gave testimony that in many respects was essentially similar to that of Nolan and Palladino. He expressed an initial doubt that in view of the fee agreed on Parrish would have been able to provide effective assistance. "But in a homicide case, whether a lawyer is retained or he's court appointed, in all likelihood, he is going to be involved in enough efforts through the preliminary examination, that the number of hours that you're talking about, for a thousand dollars, he's working at about a penny an hour if he's diligently representing the client. [¶] But I can't imagine how a lawyer could get involved in a serious case for a thousand dollars, to take it even through preliminary examination. To cover the investigation costs, to cover his time, it just is inconceivable in my mind that a lawyer would be devoting his full time to a serious case for a thousand dollars." He explained, "in a capital case, of any magnatude, fifty to a hundred thousand dollars is a range that I would think is reasonable."

Jinkerson stated that reasonably competent counsel would have retained an investigator and conducted a full and independent investigation into the facts of the case, and would "not [have relied] on the documents that are supplied by law enforcement." He added that funds for such an investigation are readily available under Penal Code section 987.9.

When as here there is evidence of drug abuse, Jinkerson went on, the investigation would also include a consideration of the defense of diminished capacity. Such a consideration, he stated, would not be barred by Dr. Glathe's report: "I think if I got this letter from Dr. Glathe, I would be concerned in terms of the—there does not appear to be any evaluation of diminished capacity at all in his letter. It seems to be—is he competent to stand trial? And is he insane under 1026? And there's no discussion of whether or not his drug dependency would have negated his specific intent at the time of the commission of the offense he was under the influence of PCP, methamphetamine, or a combination of those drugs, or other sub-

stances, so I would think that, based on the things contained in his letter, I would have concerns that this was not an adequate examination of Mr. Ledesma, particularly where obviously at the time that he's interviewed, he's been in jail since March, he's not interviewed until October. Obviously, he's not under the influence of PCP."

Jinkerson made it clear that a full and independent investigation is especially necessary before an informed decision on the use of an alibi defense can be made: "Well, my personal feeling is that an alibi defense is the weakest defense that you can raise in a criminal case; that people who come forward in alibi cases tend to be family members who have a bias. [¶] If the defendant is testifying solely as the alibi, as far as I'm concerned, that's practically not an alibi. I've avoided using alibi defenses over my career, because I think if the alibi doesn't fly, the jury then gets quickly to the point that the client is guilty, because he's presented a defense that is not believable. Where I have attempted whenever I could to try cases on some other theory, or to avoid the alibi kind of defense, because if the prosecutor is prepared to meet an alibi defense and show material misstatements by the defendant or his witnesses, then I think that's the quickest way to have your client convicted."

Jinkerson also emphasized the necessity of pretrial motions—on such foreseeable questions as the admissibility of the intercepted telephone call, the victim's identification of defendant, and the anonymous telephone calls identifying defendant as the perpetrator—in order to set the limits of the trial on certain crucial issues and also to preserve such issues for review on appeal. On the necessity of setting limits, he stated: "Well, in my review of the record, it seems to me that this is really a case that you want to contain the prosecutor as narrow and tightly as you can, and you want to attempt to suppress the evidence pretrial pursuant to 1538.5 in limine, you want to contain and limit the scope of his examination of his witnesses, with regard to the various things we talked about, including the identification, the telephone call, the anonymous phone calls saying that Ledesma did it. [¶] And then it seems to me that if you try the case on a narrow posture, of what evidence the prosecution has that's admissible, that this case is a very closely balanced case. And that there clearly is, to my mind, evidence that a jury would determine that there's reasonable doubt as to whether or not Mr. Ledesma was responsible for the homicide."

Like Nolan and Palladino, Jinkerson too was of the opinion that Parrish failed to provide defendant with effective assistance.

Unlike defendant, the People called few witnesses and did not subject them to extensive examination. Of these witnesses only four gave testimony that is relevant for our purposes.

Dr. Glathe described his examination of defendant and stated that during its course defendant told him he had committed the crimes charged. He said that the examination consisted of a one-hour interview, and included no tests either psychiatric, neurological, or physical, and specifically no test to determine the truth of defendant's alleged confession. He explained the purpose of the examination as follows: "The purpose of the exam, as I understand it on these things, and again, I'm not an attorney, obviously— about 1017, is there anything I can find in talking to an individual that can be of help to the attorney who is representing the man. And this can—it's to my mind, is a rather loose kind of approach, when you kind of see what you can find." His focus was on defendant's present mental state: "Well, the only thing I could find on examination would be what was going on presently."

As a result of this focus, Dr. Glathe explained in substance, his report concentrated on present mental state. Although the report did state that "I feel that he probably was sane pursuant to section 1026 of the Penal Code," he candidly admitted that his examination had not focused on the point: "I said probably. I was not all that rigorous in going at that, because I wasn't asked to make that specific determination. This was one of the things that I now regret having said, because it's coming up. It was a gratuitous thing— since this was for Mr. Parrish, I told him my feeling, my hunch. Usually if I was examining someone particularly charged for that, I would be more rigorous." He further admitted, "I can't imagine myself being personally capable of talking about legal matters such as diminished capacity and so forth."

Dr. Glathe stated that he spoke with Parrish about the examination over the telephone and, at Parrish's request, summarized his opinion in the report. After that conversation, he said, he had no further contact of any kind with Parrish. For the examination, Dr. Glathe was paid $75.

Officer Webster testified to his participation in the police activity that culminated in the warrantless entry into defendant's apartment and the interception of the telephone call by Officer Guerra. Although he stated that he believed exigent circumstances were present, he made it clear that there was not an immediate or continuous pursuit of defendant from the scene of the crime. He gave no testimony at all on the issue of consent. He stated that Santiago or Dominguez said that defendant had called and was expected to call again.

Judge John Schatz, who presided at defendant's trial, testified that during trial he did not see any evidence that Parrish was taking drugs, was overtired, or was incompetent. He admitted, however, that if it was true that

Parrish failed to investigate the availability of a diminished capacity defense or presented an alibi defense he believed to be false, he would be of the opinion that Parrish had not performed with reasonable competence.

Everett J. Hawker, who was the bailiff in Judge Schatz's courtroom during defendant's trial, testified that Parrish did not appear to be under the influence of drugs or alcohol or to be overtired, and opined that Parrish did an "outstanding job." He admitted, however, that he could not recall many details of the trial or any specific examples of Parrish's "outstanding" performance. Moreover, in response to appellate counsel's question, "Do you know whether or not [defendant] testified?," he said, "I don't recall. . . . [¶] I don't believe he did, though."

Following the hearing the referee filed a lengthy and exhaustive report, in which he chose to consider only those allegations of ineffective assistance on which counsel presented argument. His detailed findings and conclusions directly responsive to our questions may be summarized as follows.

1. *What evidence was contained in the public defender's report?* In its entirety, the report contained a broad but preliminary investigation into the facts of the case, including the identity, background, and expected testimony of many pretrial witnesses—the Kuebel report—and a detailed but preliminary psychosocial study of defendant which related information about his troubled life and his long and heavy use of PCP and other drugs—the Woods report. In the form in which Parrish apparently obtained it, the report comprised Woods' study and that part of Keubel's investigation that related, for example, information concerning Shay and possible criminal activity on his part and information on the "bad reputation" of the Cobble Square Apartments.

2. *What steps did Parrish take to investigate the case?* Parrish conducted virtually no investigation. The substance of his preparation was as follows. First, he apparently read the preliminary hearing transcript. Second, he reviewed the materials that the prosecution produced under the standing discovery order. Third, he somehow obtained and later reviewed some of the materials in the public defender's report, including the Woods report and part of the Kuebel report. Fourth, he interviewed defendant. Fifth, he sought the appointment of Dr. Glathe and obtained his report. Sixth, he asked Rudy Ledesma to attempt to locate a potential defense witness. Parrish, however, did nothing to follow up on the information detailed above or to obtain further information. Specifically, he did not pursue any further investigation into defendant's mental state.

3. *What evidence did Parrish discover in his investigation?* Because Parrish conducted virtually no investigation, he did not discover any evidence

in its course. As he prepared for trial, however, he did come across information relating to the following matters: the issues and facts crucial to the prosecution's case; the identity and expected testimony of Sylvia Ontiveros, Shay, and the Cowdells and their questionable backgrounds; and the troubled life of defendant and his long and serious abuse of PCP and other drugs.

4. *What evidence in the public defender's report was not discovered by Parrish?* This question evidently assumes that Parrish did not obtain the public defender's report. It appears, however, that he did in fact obtain portions, specifically the Woods report and part of the Kuebel report. Consequently, Parrish "discovered" in his own "investigation" the evidence and leads contained therein. He failed, however, to follow up on such evidence and leads.

5. (a) *Did Parrish perform inadequately by failing to investigate?* Yes.

(b) *Did Parrish perform inadequately by failing to review the public defender's report?* Yes. Although Parrish apparently reviewed the report, his review was inadequate.

(c) *Did Parrish perform inadequately by failing to object to the anonymous telephone calls?* Yes. The excuse Parrish gave for his failure to object on this point and others as well—viz., that he did not want to alienate the jury—is unpersuasive: he could have moved to bar reference to the objectionable evidence either before trial or at trial but outside the presence of the jury.

(d) *Did Parrish perform inadequately by failing to object to the intercepted telephone call?* Yes.

(e) *Did Parrish perform inadequately in any other particular?* The referee considered only those allegations to which counsel directed argument, and concluded that Parrish's performance was inadequate in each of the following particulars.

(i) Parrish failed to adequately investigate the facts of the case or research the law and procedure applicable thereto, especially with regard to the avail- ability of the defense of diminished capacity. In support, the referee found generally that in spite of the fact that this was his first capital case Parrish did not research the applicable law and procedure, and concluded that he should have. Specifically, he found that there were several resources available to aid defense counsel in trying capital cases and that Parrish evidently made use of none, and concluded that he should have. He also found, as

noted above, that Parrish conducted virtually no investigation, less still the full and independent investigation he should have conducted.

The referee also found that Parrish did not seriously consider the use of a diminished capacity defense. He concluded that to the extent Parrish did consider the defense he failed to exercise reasonable professional judgment. Specifically, the referee found that none of the grounds on which Parrish rested his decision not to present or even further investigate a diminished capacity defense was adequate: (1) the detail of defendant's alleged confession is not inconsistent with the defense, and in any event the alleged confession itself may not refer to anything that actually happened but may simply be the creation of defendant's secondary memory; (2) the apparent rationality that defendant exhibited in their discussions, which took place after he had been in custody and evidently away from drugs for a significant period of time, did not negate the existence of diminished capacity at the time of the murder; (3) Dr. Glathe's report did not contain facts sufficient to allow reasonably competent counsel to reject a diminished capacity defense, but rather contained information that would have led such counsel to investigate further the availability of the defense; and (4) Parrish's personal belief that the use of drugs or alcohol does not affect a person's criminal responsibility was, of course, immaterial.

(ii) Parrish failed to make use of the evidence and leads contained in the materials he obtained from the public defender's office. In support, the referee determined Parrish should have interviewed Woods and used her report to evaluate the availability of a diminished capacity defense. He also concluded that Parrish should have used the report to prepare for the penalty phase and should have called Woods as a witness at that phase to present mitigating evidence relating to defendant's troubled life and his use of drugs. The referee further concluded that Parrish should have used the Kuebel report to undertake further investigation into the questionable backgrounds of Sylvia Ontiveros, Shay, and the Cowdells with a view toward attacking their credibility on cross-examination.

(iii) Parrish failed to attempt to bar reference to the victim's extrajudicial identification of defendant. In support of this conclusion the referee found that Parrish knew of the identification and of its critical importance to the prosecution's case. He concluded that Parrish could and should have made an effort to keep the identification from the jury, and that—in light of the fact that the identification was inadmissible hearsay—such an effort would have been successful.

(iv) Parrish failed to attempt to bar reference to the telephone call intercepted by Officer Guerra. In support of this conclusion the referee found

that Parrish knew of the intercepted telephone call and of its critical importance to the prosecution's case. He concluded that Parrish should have made an effort to keep the call from the jury. He further concluded that such an effort would likely have succeeded: the police intercepted the telephone call after they entered defendant's residence without a warrant and apparently in the absence of exigent circumstances or effective consent.

(v) Parrish failed to attempt to bar reference to the anonymous telephone calls identifying defendant as the perpetrator of the crimes charged. In support of this conclusion the referee found that Parrish knew of the anonymous telephone calls and of their importance to the prosecution's case. He concluded that Parrish should have made an effort to keep the calls from the jury. He further concluded that in view of the fact that the calls were plainly inadmissible hearsay such an effort would have succeeded.

(vi) Parrish failed to undertake an investigation of Sylvia Ontiveros, Shay, and the Cowdells, and specifically failed to make any effort to determine whether he had obtained through discovery all the material to which he was entitled relating to Shay and the Cowdells. In support of this conclusion the referee found that Parrish knew that Sylvia Ontiveros, Shay, and the Cowdells were potential witnesses to defendant's alleged admissions and that their backgrounds were questionable. He concluded that in view of the critical importance of the testimony to the prosecution's case, Parrish should have sought further evidence that might have enabled him to mount a strong attack on their credibility. The referee also found that Parrish failed the information he had in fact obtained to fashion strong cross-examination.[7]

---

[7] In the referee's words: "Parrish also had tapes which had been provided to him by the prosecution, one of which was by Shay. On this tape Shay is recorded as having said to the police that the defendant told him that he shot the victim six times but the actual record shows the victim was shot only three times. When Petitioner's counsel commented that Parrish did not develop that discrepancy, Parrish replied, 'I can't recall' [citation]. Parrish admits that developing the discrepancy would be a material attack on Shay's credibility. [Citation.] If the defendant did tell Shay that six shots were fired, then he must have been hallucinating about the number of shots which would have been another reason for Parrish to check on Ledesma's mental condition at the time of the crime.

"The Cowdells on a tape to the police stated that they saw the defendant in Utah in July or August. The robbery was in August but the murder was a week later in September. Parrish agreed. The police in asking the question suggested that it could have been after July or August. And they agreed. In answer to Mr. Bryan's inquiries: 'And you did not develop that at the trial, did you?' Parrish replied, 'No, I didn't.' [Citation.]

"In that same tape recording, the Cowdells . . . said that he, Ledesma, put straightening in his hair so it would be straight and not curly. Parrish agreed that the Cowdells made this statement on the recording. [Citation.] Parrish then concurs with Petitioner's counsel's statement that Ledesma does not have to use straightener in his hair. [Citation.] Parrish admits he did not develop this area for impeachment purposes. [Citation.] And in that same Cowdell's recording the recording started off with the police telling the Cowdells that the defendant had committed robbery and murder. Parrish agreed with the reference in the recording. Then after such a statement by the police, the Cowdells came forth with the details.

(vii) Parrish failed to make any effort to test the testimonial competence of Sylvia Ontiveros and Sharla Cowdell. In support of this conclusion the referee found that Parrish was told by defendant that both women had seriously abused drugs and were mentally unstable. He concluded that in view of the critical importance of their testimony to the prosecution's case, Parrish should have attempted to have the women declared incompetent.

(viii) Parrish failed to attempt to bar reference to defendant's juvenile record or to his alleged participation in unproved crimes other than those for which he was being tried. In support, the referee found that Parrish knew of defendant's juvenile record and the existence of the other-crimes evidence. He concluded that in view of the potentially prejudicial effect of such evidence Parrish should have made an effort to keep it from the jury. He further concluded that inasmuch as the prejudicial effect of the evidence clearly outweighed whatever probative value it might have had, Parrish would have been successful in such an effort.

(ix) Parrish failed to present a defense of diminished capacity at the guilt phase. In support of this conclusion the referee found that evidence of diminished capacity plainly existed and was in fact strong, and hence that the defense was available and, indeed, firmly supported. He concluded that Parrish should have been aware of these facts and as a result should have presented the defense.

(x) Parrish failed to present evidence of defendant's troubled life and his use of drugs in mitigation at the penalty phase. In support of this conclusion the referee found that Parrish knew defendant had seriously abused PCP and other drugs over many years and had been using such drugs at the time of the crimes charged. He concluded that Parrish should have presented evidence on this issue.

As the referee explained, "In a death penalty situation as the case at bar the courts are very liberal with respect to the admissibility of evidence . . . in mitigation of the punishment to be imposed, e.g., life in prison without parole or the death penalty. Evidence that will give the jury an opportunity to be sympathetic to the convicted defendant in assessing the penalty will

There is nothing in the record to show that Parrish tried to develop that line of inquiry, i.e., that those suggestions by the police could have helped the Cowdells in telling their story. In answer to the Petitioner's counsel's questions, if he recalled the testimony as to who found the body in the case, Parrish replied, 'A couple in a camper stopping by the roadside.' [Citation.] But on the police tape recording of Shay, Shay said that Ledesma told him two bikers found the body. Parrish agrees with that tape reference. But Parrish neglected at the trial to develop that Shay's statement was completely contrary to the facts as to what actually happened. Parrish admits that he did not develop the factual inconsistency as a basis to attack the credibility of Shay. [Citation.]"

usually be admitted for the jury's examination and consideration. [¶] In the instant case, the record is barren of such evidence. Defense counsel did not present to the jury any substantial evidence that could be remotely classified as mitigation in punishment or gain sympathy for the convicted Ledesma."

The referee continued: "Mr. Parrish admits he did his worst at the Penalty Phase. [Citation.] He knew of people he could have brought in to testify. He admits that his preparation in that area was not as thorough as it could have been. [Citation.] By his own admission he quit as Defense Counsel after the Jury announced its Guilty verdict. In his own words: 'I tended to kind of give up after the Guilt Phase. Perhaps I should have had a lot more preparation on that beforehand and been better prepared.' [Citation.] He goes on: 'I just sort of lost my gas and my energy at that point.' [Citation.] He recognized that he should have brought in Marynella Woods to testify at the Penalty Phase. He admitted, 'I think she would have been useful.' "

The referee went on: "As a practical matter Parrish abandoned his client at the Penalty Phase and sealed his doom with the aggravating evidence introduced by the prosecution at the Penalty Phase. . . . [¶] . . . Parrish failed miserably to put on a substantial amount of evidence which was available to him for the jury's consideration in mitigation. Parrish did not even go into the drug problems with any of his witnesses at the Penalty Phase. Defendant Ledesma lost at the Penalty Phase because of Parrish's default."

(xi) Parrish failed to request at the penalty phase any instructions other than CALJIC No. 2.60 (1979 rev.) and CALJIC No. 2.61 (1979 rev.) In support of this conclusion the referee apparently concluded that Parrish should have requested other unspecified instructions.[8]

The referee also concluded in effect that Parrish's disposal of his files some years after the trial—although without possible effect on the trial's result—supported, and perhaps compelled, the inference that he violated not

---

[8] The referee also found true the allegation that Parrish failed to provide effective assistance by "Waiv[ing] . . . the presence of a material witness . . . ." The referee appears to have done so by mistake, evidently believing the allegation referred—as it did not—to Woods.

The referee found the testimony by the trial judge and the bailiff in support of the adequacy of Parrish's performance to be of little weight: the judge, who had to be alert to all that was happening during trial, might not have noticed Parrish's inadequacies; and the fact that the bailiff, "who claimed he was alert as to what was going on in the Ledesma trial[,] . . . state[d] that he did not believe that the main character, Ledesma, testified at the trial, dilutes much of his testimony."

The referee concluded that defendant had not met his burden of proving that Parrish performed without reasonable competence with regard to the allegations concerning his failure to seek the removal of the juror whose mother had been beaten, sexually assaulted, and murdered, and his failure to present an opening statement at the guilt phase.

only the duty to perform with reasonable competence but also the fundamental duty of loyalty.

In the referee's words: "Accepting as accurate and credible Parrish's representation of what the Ledesma file contained, how the file got wet and the fact that some of the contents became mildewed and what disposition he allegedly made of the Ledesma file at the dump (a Death Penalty case), it demonstrated a degree of irresponsibility not to be expected of a competent attorney. In the opinion of the Referee, such conduct on the part of Parrish is some evidence of just how he ab initio conducted his pre-trial and trial presentation, his investigation (if any) and all other elements of the defense that would go into the work necessary to defend a capital case. Add to this the fact that this was Parrish's first capital case and the magnitude of his irresponsibility becomes impressive. The least that could be expected of a competent attorney in such a serious case is that he should have been alerted to take every reasonable precaution to maintain the sanctity of the file and its contents in anticipation of giving whatever assistance he could in the appellate process whether he or some other attorney would be handling the automatic appeal. Certainly he could have retrieved those documents that he admitted were legible. Since he did not identify which documents were legible, we cannot make any judgment as to their importance or to what extent they would show how effectively or ineffectively he conducted the trial during its process. He was also aware prior to alleged water damage, that the Petitioner's counsel requested the Ledesma files but this request was ignored by Parrish. Even when the files got water-logged as he represented, he could have retained them or sent them to Mr. Bryan. With retention of the files it could have easily been determined what reports, etc., the files contained. By his destruction of all his Ledesma files, we have to depend upon his own representation as to what information and reports he had in his possession and from the totality of what the Referee had heard throughout this hearing, his credibility is suspect.

"The scenario of Parrish's irresponsible course of action becomes more pronounced in the record which shows on December 22, 1980, within a short time after his appointment by the Supreme Court to handle the appeal process, Petitioner's counsel, Mr. Bryan, wrote Parrish a letter dated December 22, 1980, advising him of his appointment of counsel for Ledesma. Parrish admits getting this letter. . . . [¶] This letter also advised Parrish of Bryan's attempt to contact Parrish by phone without success. The letter stressed the importance of Parrish and Bryan getting together to review 'all relevant files, investigator's reports, and motions in your possession.' [Citation.] Although he admitted receiving the letter, Parrish did not reply. Further evidence of Parrish's irresponsibility is demonstrated in the record by his retort that he admitted receiving the letter, i.e., 'You should have

called me and said you wanted to pick up those stinking files. I would have given them to you.' [Citation.] It would have been more responsible (or at least common courtesy) to either answer the letter or telephone Bryan advising him that the files were in bad condition but he would be glad to turn them over to him if he came to pick them up. The only reply Parrish made, according to the record, is an alleged telephone call leaving word— but he does not identify what he said—nor can Parrish recall if he talked to a secretary or an answering machine. [Citation.] Nor can he recall if the call was in December, January, or February. Parrish further admits getting other messages on his machine from Petitioner's counsel to call back—he admits he may have called back once or twice. [Citation.]

"Parrish's story of the above exchange is not very convincing. The Referee had ample opportunity to observe [him] during this exchange of questions and answers (and also with respect to questions and answers at other times during the hearing). The credibility and accuracy of [his] responses are suspect in the mind of the Referee.

"The attitude of Parrish with respect to the entire case which in part explains the course of action he took or did not take with reference to his responsibility as attorney for Ledesma, is forcefully demonstrated by his testimony [to the effect] . . . there should have been a follow-up by Bryan to get the file; that he, Parrish, was no longer representing Ledesma. 'And I did not feel that I should be out there doing a sprint to help you in the case.' (But he is apparently overlooking the fact that his former client is sitting on death row.) 'You are being paid by the hour. I was not. If you want to send a man down you could have had the files. You knew where I lived.' But the only address that Bryan had at the time was a post office box number.

"Subsequent to the transmission of the letter of December 22, 1980, . . . to Parrish, Petitioner's counsel sent another letter to Parrish dated January 28, 1981, . . . which Parrish admitted receiving. [Citation.] That letter just about repeated the same message as [the earlier letter], namely, that Parrish and Bryan should get together to discuss the case, review the files and investigator's report, etc., and a request for a response. Parrish did not respond by letter, but he thinks he may have phoned [citation] but apparently no contact was made with anyone.

"A third letter that was transmitted by Petitioner's counsel to Parrish dated April 10, 1981 . . . referred to the letter of December 22 and again repeated the substance of the request contained in [the earlier letters], i.e., the need for Bryan to talk with Parrish as soon as possible and the need to review all relevant files and investigator's reports and motions in his

possession. Parrish guessed he got it but can't recall responding to it. [Citation.]

"The first two letters from Petitioner's attorney . . . were received by Parrish before the water damage to the Ledesma files as previously alleged. [Citation.] This course of conduct on the part of Parrish at this point in time with respect to the Ledesma file . . . suggest[s] the obvious question: Did the files contain material or the lack of materials which would reflect in some negative way on the manner in which he conducted the defense?"

6. *If Parrish was inadequate in any regard, did such inadequacy prejudice the defense?*The referee concluded in effect that because of the evident closeness of the case, each of Parrish's identified inadequacies—with the sole and necessary exception of his post-trial conduct—subjected the defense to prejudice.[9]

At the end of his lengthy and exhaustive report the referee concluded as follows: "From the totality of the evidence and testimony presented at this Hearing, the Referee finds and recommends that the Petitioner Ledesma be granted the relief prayed for in the Writ of Habeas Corpus, i.e., that he be granted a new trial as to the Guilt Phase and also to the Penalty Phase."

## IV. CONTENTIONS

Defendant raises numerous contentions on appeal and on habeas corpus going to the issues of guilt, special circumstance, and penalty. As will appear, we need address only one.

### A. *Ineffective Assistance of Counsel*

On both appeal and habeas corpus, defendant contends that during the guilt phase Parrish failed to provide him with the effective assistance of counsel—i.e., he failed to perform with reasonable competence and as a result subjected the defense to prejudice. As we shall explain, defendant cannot support his claim on appeal but amply supports it on habeas corpus.

---

[9] The referee concluded that defendant had not met his burden of proving that he was prejudiced by Parrish's inadequacy, if any, with regard to the following: his guarantee that he would win acquittal because the evidence was insufficient; his failure to request any instructions at the guilt phase; his misstatement during redirect examination of Sergeant Kahn at the penalty phase which suggested that defendant had committed more uncharged robberies than Kahn stated on cross-examination; and his failure to communicate with defendant after the sentence of death was imposed or to cooperate with appellate counsel.

### 1. *The Law*

Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel. (E.g., *Strickland* v. *Washington* (1984) 466 U.S. 668, 684-685 [80 L.Ed.2d 674, 691-692, 104 S.Ct. 2052, 2063] [discussing federal constitutional rights]; *People* v. *Pope, supra,* 23 Cal.3d 412, 422 [discussing both state and federal constitutional rights].) The ultimate purpose of this right is to protect the defendant's fundamental right to a trial that is both fair in its conduct and reliable in its result. (See, e.g., *Strickland, supra,* at pp. 684-687 [80 L.Ed.2d at pp. 691-693, 104 S.Ct. at pp. 2063-2064]; *Pope, supra,* 23 Cal.3d at pp. 423-425.)

Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance. (E.g., *Strickland, supra,* 466 U.S. at p. 686 [80 L.Ed.2d at pp. 692-693, 104 S.Ct. at p. 2064]; *Pope, supra,* 23 Cal.3d at pp. 423-424.) Specifically, it entitles him to "the reasonably competent assistance of an attorney acting as his diligent conscientious advocate." (*United States* v. *De Coster* (D.C.Cir. 1973) 487 F.2d 1197, 1202, italics deleted; accord, *Pope, supra,* at p. 423; see, e.g., *Strickland, supra,* at pp. 686-689 [80 L.Ed.2d at pp. 692-694, 104 S.Ct. at pp. 2064-2065].)

Under this right, the defendant can reasonably expect that in the course of representation his counsel will undertake only those actions that a reasonably competent attorney would undertake. But he can also reasonably expect that before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. (See, e.g., *In re Hall* (1981) 30 Cal.3d 408, 426 [179 Cal.Rptr. 223, 637 P.2d 690]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 166 [158 Cal.Rptr. 281, 599 P.2d 587]; see also *Strickland, supra,* 466 U.S. at pp. 690-691 [80 L.Ed.2d at pp. 695-696, 104 S.Ct. at p. 2066] [implying that counsel must make "all significant decisions *in the exercise of reasonable professional judgment*" (italics added)].) If counsel fails to make such a decision, his action—no matter how unobjectionable in the abstract—is professionally deficient. (See, e.g., *In re Hall, supra,* at p. 426 [emphasizing that the exercise of counsel's professional discretion must be reasonable and informed and founded on reasonable investigation and preparation]; *People* v. *Frierson, supra,* 25 Cal.3d at p. 166 [same]; see also *Strickland, supra,* 466 U.S. at pp. 690-691 [80 L.Ed.2d at p. 695, 104 S.Ct. at p. 2066] [implying that "strategic choices made after less than complete investigation are [un]reasonable precisely to the extent that reasonable professional judgments [do not] support the limitations on investigation"].)

■■■ "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." (*Strickland, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693, 104 S.Ct. at p. 2064]; accord, *People* v. *Fosselman, supra,* 33 Cal.3d 572, 583-584.) "First, the defendant must show that counsel's performance was deficient." (*Strickland, supra,* at p. 687 [80 L.Ed.2d at p. 693, 104 S.Ct. at p. 2064]; accord, *Pope, supra,* 23 Cal.3d at p. 425.) Specifically, he must establish that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland, supra,* at p. 688 [80 L.Ed.2d at pp. 693-694, 104 S.Ct. at p. 2065]; accord, *Pope, supra,* 23 Cal.3d at pp. 423-425.)

■■■ In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny. (E.g., *Strickland, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at p. 694, 104 S.Ct. at p. 2065]; see, e.g., *Pope, supra,* 23 Cal.3d at p. 424.) There are, broadly, two reasons that justify such a level of scrutiny.

The first and fundamental reason involves the danger of second-guessing in reviewing claims of ineffective assistance. Judges recognize, to be sure, that the means of providing effective assistance are many and that as a consequence counsel has wide discretion in choosing which to use. But under the sometimes imperceptible influence of the failure of counsel's efforts to obtain a successful result, it is often practically difficult for judges to view and assess the reasonableness of counsel's acts or omissions, as they must, under the circumstances as they stood at the time that counsel acted or failed to act. (See, e.g., *In re Hall, supra,* 30 Cal.3d at p. 426; *People* v. *Frierson, supra,* 25 Cal.3d at p. 166.) As the *Strickland* court stated, "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (466 U.S. at p. 689 [80 L.Ed.2d at p. 694, 104 S.Ct. at p. 2065].)

The second reason, which derives from the first, involves the adverse consequences that systematic "second-guessing" might have on the quality of legal representation provided to criminal defendants and on the functioning of the criminal justice system itself. Specifically, counsel might be tempted to exercise his discretion primarily to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial, thereby putting his own interests before those of his client. Indeed, counsel might even be led not to accept certain cases at all. Also, unmeritorious ineffective-assistance claims might increase and cause a waste of scarce judicial resources.

Again as the *Strickland* court stated, "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." (466 U.S. at p. 690 [80 L.Ed.2d at p. 695, 104 S.Ct. at p. 2066].)

We must emphasize, however, that deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. "[D]eference is not abdication" (*People* v. *McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011]); it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions. Otherwise, the constitutional right to the effective assistance of counsel would be reduced to form without substance.

■ In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim. The United States Supreme Court expressly enunciated this requirement in *Strickland.* (466 U.S. at pp. 691-692 [80 L.Ed.2d at p. 696, 104 S.Ct. at p. 2067].) And we implied as much in *Fosselman.* (33 Cal.3d at pp. 583-584.)

In certain contexts, prejudice is conclusively presumed. For example, "Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. [Citation.] Prejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost. [Citation.] Moreover, such circumstances involve impairments of the . . . right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent." (*Strickland, supra,* 466 U.S. at p. 692 [80 L.Ed.2d at p. 696, 104 S.Ct. at p. 2067].)

Generally, however, prejudice must be affirmatively proved. (*Strickland, supra,* at p. 693 [80 L.Ed.2d at p. 697, 104 S.Ct. at p. 2067]; *Fosselman, supra,* 33 Cal.3d at pp. 583-584.) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable prob-

ability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* at pp. 693-694 [80 L.Ed.2d at pp. 697-698, 104 S.Ct. at pp. 2067-2068]; see *Fosselman, supra,* at pp. 583-584.) Specifically, "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." (*Strickland, supra,* at p. 695 [80 L.Ed.2d at p. 698, 104 S.Ct. at p. 2069].)

■ Finally, the burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence. (*In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].)

### 2. *Application to This Case*

■ Although on appeal he makes substantially the same allegations as he makes in his petition for habeas corpus, defendant is constrained by what he himself recognizes as the inadequacy of the appellate record to argue that Parrish's passivity during the guilt phase, in itself, constitutes professionally deficient performance. His argument is not without substance, but must nevertheless be rejected.

"In some cases . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." (*Pope, supra,* 23 Cal.3d at p. 426.)

Here, the appellate record, as defendant impliedly concedes, sheds no light on why Parrish conducted the defense as he did. Parrish was not asked to explain his performance. Although from a review of the record on appeal alone we have serious doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not. The argument, therefore, must be rejected.

On habeas corpus defendant makes the numerous allegations of ineffective assistance that we discussed in Part III, *ante.* After the hearing, the referee made detailed and exhaustive findings and conclusions and on the basis thereof determined that Parrish failed to provide defendant with effective

assistance in the several particulars noted above, and accordingly recommended that the petition be granted and the writ issue.

■ The Attorney General argues that in concluding that Parrish's performance was deficient and subjected the defense to prejudice the referee erred. As we shall explain, the argument is without merit.

Our standard of review in these circumstances is settled. A referee's legal conclusions are subject to independent review. (Cf. *People* v. *Louis* (1986) 42 Cal.3d 969, 985-986 [232 Cal.Rptr. 110, 728 P.2d 180] [discussing appellate review of trial court determinations generally].) As to findings of fact, they "are, of course, not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. [Citation.] However, where the findings are supported by 'ample, credible evidence' [citation] or 'substantial evidence' [citation] they are entitled to great weight [citations] because of the referee's 'opportunity to observe the demeanor of the witnesses and weigh their statements in connection with their manner on the stand. . . .' [Citation.]" (*In re Branch* (1969) 70 Cal.2d 200, 203, fn. 1 [74 Cal.Rptr. 238, 449 P.2d 174]; accord, *In re Hall, supra,* 30 Cal.3d at p. 416.) Finally, a referee's resolution of mixed law-fact questions is generally subject to independent review as predominantly questions of law—especially so when constitutional rights are implicated. (Cf. *People* v. *Louis, supra,* at pp. 986-987 [discussing appellate review of trial court determinations generally].) Such questions include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense. (See *Strickland, supra,* 466 U.S. at pp. 697-698 [80 L.Ed.2d at p. 700, 104 S.Ct. at p. 2070].)

The Attorney General raises five major objections to the referee's report. ■ He first objects to the referee's conclusion that Parrish provided defendant with ineffective assistance by failing to investigate the facts of the case or to research the law applicable thereto, especially with regard to the defense of diminished capacity. His argument, in essence, is as follows: the referee found that Parrish created the alibi and took an active part in the decision to use, and in the preparation of, the alibi defense; the record, however, establishes that it was defendant who created and insisted on presenting the defense; accordingly, Parrish had no choice but to present that defense; therefore, he was excused from what might otherwise have been his duty to investigate a diminished capacity defense.

The premise of the Attorney General's argument is unsound. First, although in parts of the report the referee uses language that may be construed

as expressing or implying a finding that Parrish created the alibi, he appears not to have made such a finding. Reading the report as a whole, we conclude the referee found only that Parrish took an active part in the decision to use, and in the preparation of, the alibi defense. He also impliedly found that defendant did not insist on the defense.

Second, even to the extent that the Attorney General's argument attacks the findings of Parrish's active role and defendant's noninsistence, it must be rejected. It is true that Parrish made the following statements in the earlier part of his testimony: "[defendant] had thought up and prepared an alibi"; "He prepared it religiously and insisted upon giving it"; "he insisted on it. I agreed to assist him to testify. I didn't tell him what to say"; and, "I discussed alibi with Fermin from the time that he met with me, shortly from the first few times we met. And as I indicated before, he had worked out a very different and complete alibi in his mind . . . . He indicated to me that he could testify that he was somewhere else."

In the latter part of his testimony, however, Parrish stated in effect that it was he who was ultimately responsible for the use of the alibi defense. On cross-examination the following colloquy occurred.

"Q. Did Mr. Ledesma insist on testifying? A. No, I got to be fair to him. I helped him prepare that alibi. If I told him not to testify, he would not have done so. He prepared that alibi rather completely. But whether or not I encouraged him, I don't know. [¶] I know that he had it worked out. I didn't have to suggest it to him. I just don't want to say anything I'm not certain of. [¶] When it comes to him, Fermin was pretty much putty in my hands. He was cooperative to the greatest extent. So, the blame is on me as far as having superior knowledge and having superior ability in some ways, at least I thought. [¶] He was very cooperative. He would have done what I said. I know that.

". . . . . . . . . . . . . . . . .

"Q. Who was the first one that suggested the alibi? A. Fermin and I discussed it. He had the alibi worked out. I can't tell you who suggested using it. I decided to use it.

"Q. Who first suggested it? A. He told me he had one worked out, if that's what you want to know. I didn't work it out.

"Q. Did he tell you that's what he wanted to do? A. I can't say that of him. We agreed to do it. If I told him not to do it, I'm sure he would have not done it. Whether it was his idea or my idea, I can't tell you. I think I

may have told you before that it was his idea, but I had the power to tell him not to use it. Fermin was putty in my hands at that point. I have to admit that."

The Attorney General argues that Parrish's later testimony is not worthy of consideration. To begin with, he contends these statements are inconsistent with evidence in the trial record, citing defendant's expressed desire, against Parrish's advice, to tell his story again at the penalty phase through testimony as a witness or argument as cocounsel. The point is not persuasive. Parrish was perhaps unsuccessful in one part: defendant persisted in his desire to present argument, made a motion through Parrish, and was refused. But Parrish was plainly successful in the other part: defendant did not testify during the penalty phase. In any event, even if Parrish's later testimony is inconsistent with certain evidence in the trial record, such inconsistency merely affects the weight of the testimony.

Pointing out that the statements in issue were made after Parrish manifested his change of heart, the Attorney General also argues, in reliance on *People* v. *Beagle* (1972) 6 Cal.3d 441, 457 [99 Cal.Rptr. 313, 492 P.2d 1], that they amount to a claim of inadequacy by trial counsel in aid of his client posttrial and hence are not persuasive. But when, as here, such statements are made by counsel whose inadequacies are manifest, they may not be dismissed out of hand. In any event, Parrish testified to similar effect before his change of heart. During the course of direct examination by defendant's appellate counsel, he was asked, "Also, you said, the defendant, Mr. Ledesma, insisted on an alibi defense?," and answered, "Well, no. I can't put that on him in the sense that he told me this or nothing. It simply is that we discussed the possibilities of going for broke or an acquittal or going for a life in prison. [¶] And the consensus was that he had already prepared in his own mind an alibi, and was prepared, I thought, to provide witnesses to corroborate that and he made the decision that going for broke was better than taking life in prison. That was part of it. [¶] I tended to agree with him."

From our review of the foregoing testimony and the record of the habeas corpus proceeding in its entirety, we conclude that the finding that Parrish took an active part in the decision to use, and in the preparation of, the alibi defense, and the implied finding that defendant did not insist on the defense, must each be upheld as supported by substantial evidence.

But even if defendant had in fact insisted on the alibi defense from the very beginning and had as a consequence rejected the use of diminished capacity or any other "mental defense" and refused to cooperate in developing such a defense, the Attorney General's contention would still lack

merit. Counsel's first duty is to investigate the facts of his client's case and to research the law applicable to those facts. "Generally, the Sixth Amendment and article I, section 15 require counsel's 'diligence and active participation in the full and effective preparation of his client's case.' [Citation.] Criminal defense attorneys have a ' "duty to investigate carefully all defenses of fact and of law that may be available to the defendant . . . ." ' " (*Pope, supra*, 23 Cal.3d at pp. 424-425.) The client's initial insistence on one defense and opposition to all others does not "excuse counsel from undertaking sufficient investigation of possible defenses to enable counsel to present an *informed* report and recommendation to his client." (*People* v. *Mozingo* (1983) 34 Cal.3d 926, 934 [196 Cal.Rptr. 212, 671 P.2d 363], italics original.) This is especially so when, as here, the evidence available to counsel supports a mental defense and the defense allegedly insisted on by the client is uncorroborated or, indeed, contradicted in whole or in part by the available evidence. (*Ibid.*) That counsel, as a plurality of this court have stated, may be compelled to yield to his client's right to insist on the presentation of a defense of his own choosing (*People* v. *Frierson* (1985) 39 Cal.3d 803, 812-816 [218 Cal.Rptr. 73, 705 P.2d 396]) does not excuse him from his duty to investigate and research other defenses so as to make an informed recommendation to his client (see *id.* at p. 817).

■ The Attorney General maintains, however, that on the facts of this case Parrish was indeed excused from any duty to engage in further factual investigation and legal research on the defense of diminished capacity. He cites the following language from *Strickland*: "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." (466 U.S. at p. 691 [80 L.Ed.2d at pp. 695-696, 104 S.Ct. at p. 2066].) The Attorney General argues in effect that the nature and tone of defendant's alleged confession reasonably led Parrish to believe that defendant was legally responsible at the time of the killing and on that basis to refrain from pursuing further investigation and research. He adds that Parrish's decision was supported by Dr. Glathe's report.

We cannot accept the Attorney General's point. As the testimony shows, the nature and tone of the alleged confession—made about seven months

after defendant had been put in custody and denied access to PCP and other unlawful substances—says little if anything about defendant's state of mind at the time of the killing. Had Parrish undertaken adequate preliminary investigation and research on mental defenses in general and diminished capacity in particular, he would have recognized this fact. Indeed, we believe he should have recognized the fact solely on the basis of his experience as a criminal defense lawyer. More important, however, than what Parrish should have recognized is what he actually did recognize: the tone of the alleged confession, he admitted, led him to conceive doubts about defendant's mental state and not to dismiss such doubts.

Under cross-examination, Parrish was asked the following questions and gave the following answers: "Q. Why did you get Glathe's report? A. Because [defendant] told me he had been using a lot of drugs and because I felt that at some point I had to know his mental condition. Particularly before he testified. And there was a lot of other things. The whole nature of his attitude of just not being remorseful about it.

"Q. What did that have to do with it? A. Well, he was just—it was just a matter of fact story as he was telling me that it just happened A, B, C, D, as if I tell you how I went home and had dinner and watched TV last night. It was just the way he described it. [¶] There was no emotion to it. He was flat in his attitude about it *and that triggered me to think that that's a little bit strange.*" (Italics added.)

Further, as the testimony of Drs. Rosenthal and Smith and Attorneys Nolan, Palladino, and Jinkerson makes clear, reasonably competent counsel would have had some doubts about the truth of the alleged confession: it could have been the expression of a fictive "secondary memory" rather than an accurate statement of what actually happened.

Nor can we accept the Attorney General's claim that Parrish's decision not to pursue further investigation and research was supported by Dr. Glathe's report. As the testimony of both the medical and legal experts establishes, the report would have been understood by reasonably competent counsel to speak more to defendant's competence to stand trial than to his mental state at the time of the killing, to provide an insufficient basis to reject a defense of diminished capacity, and indeed to raise issues calling for further investigation and research.

In sum, the Attorney General does not persuade us that the referee erred in concluding that Parrish provided defendant with ineffective assistance by failing to undertake adequate investigation and research, especially with regard to diminished capacity. He does not show that the referee erred in

concluding that Parrish's performance was deficient, and does not even attempt to show that a result more favorable to defendant would not have occurred in the absence of Parrish's failings.

■ The Attorney General's second objection is that the referee erred in concluding that Parrish provided defendant with ineffective assistance by failing to move pretrial to bar reference to the victim's extrajudicial identification of defendant or to object at trial to the prosecutor's comments and questions relating thereto. He insists that neither the conclusion that Parrish's performance was deficient nor the conclusion that defendant was prejudiced thereby can stand. After independent review, we are compelled to disagree.

The Attorney General first argues in substance as follows: in the presence of Parrish the prosecutor committed himself not to introduce the extrajudicial identification, and hence Parrish was not incompetent in failing to move pretrial to suppress the identification; the prosecutor's comments and questions effectively placing the identification before the jury were unobjectionable, and hence Parrish was not incompetent in failing to move pretrial to prevent them or to object to them at trial. We are not persuaded.

We grant that, presented with the prosecutor's commitment not to introduce the extrajudicial identification, Parrish may not have been incompetent in failing to move pretrial to suppress. But we cannot agree that his failure to move pretrial to bar all reference to the identification or at least to object to such reference at trial did not amount to incompetence. In view of his commitment not to introduce the extrajudicial identification, the prosecutor's comments and questions, which presented the fact to the jury, were plainly objectionable. Moreover, they went to the crucial issue in the case: the identity of the person who robbed Flores on August 26, 1978, and who presumably returned to eliminate him as a potential witness on September 5, 1978. In *People* v. *Nation* (1980) 26 Cal.3d 169, 179-182 [161 Cal.Rptr. 299, 604 P.2d 1051], we held that trial counsel was incompetent in failing to take any steps to keep from the jury identification evidence that was critical to the prosecution's case but of questionable admissibility. Similarly, Parrish's failure to take any steps to keep from the jury all reference to the identification must also be held to constitute incompetence.

The Attorney General next argues that Parrish's deficient performance did not prejudice defendant. He first asserts that defendant himself testified to the identification and hence should not be heard to complain. But, as the colloquy set forth in the margin shows, defendant's testimony on the point was elicited through questioning by the prosecutor that presented the identification to the jury in violation of his commitment—questioning to which

Parrish made no objection.[10] Thus, defendant may properly complain of Parrish's incompetence. The Attorney General also claims in substance that the trial court effectively neutralized the force of the references and thereby prevented Parrish's inadequacy from prejudicing defendant by responding, as follows, to the jury's request for a reading of Sergeant Traskowski's testimony "re: positive I.D., i.e., I.D. of Ledesma": "In connection with Officer Traskowski and the identification of the photographs shown. The transcript does not show that he was asked a direct question. That being a hearsay situation, the district attorney proceeded in the manner that the reporter will read to you." While the court's response may have disabused the jury of the notion that Traskowski *testified* that the victim identified defendant—a notion that the prosecutor's improper comments and questions effectively engendered—it certainly did nothing to neutralize the force of the reference. Indeed, it all but stated that the victim had in fact identified defendant but that Traskowski was prohibited by a technical rule of evidence from testifying to that effect.

In conclusion, the referee's determination that Parrish's deficient performance prejudiced defendant must be affirmed. First, the prosecutor's

---

[10] "Q. (By Mr. Kennedy) *Why do you suppose this boy at the gas station who was killed, identified you when he was shown those pictures?* A. He did not make a positive I.D.

" . . . . . . . . . . . . .

"Q. (By Mr. Kennedy) Well, I'm not interested in the contents of the police reports. *I'm just asking how is it do you think this boy identified you, when you were back in an apartment, partying?* A. What was that again?

"Q. *Why do you suppose this boy identified you as the robber, when you weren't even there?*

" . . . . . . . . . . . . .

"Q. (By Mr. Kennedy) *Do you know any reasons why this boy would have identified you as the robber?* A. Well, if you look at George, man, he looks a lot like me.

" . . . . . . . . . . . . .

"Q. *When was the first that you found out that the gas station attendant had I.D.'d you as the robber?* A. When was the first time I heard?

"Q. Yes. A. That he identified me?

"Q. Yeah. A. I really—I really don't know. It's just—that's in the transcript and all the police reports.

"Q. Was it after you were arrested? A. I don't think he positively identified me, but I knew they were looking for me for robbery and murder.

"Q. *Well, can you say when it was that you first found out that the man had I.D.'d you as the robber?* A. I got the police reports, I think—I think—

"Q. And— A. —Reading it.

"Q. And when did you get the police reports then? A. I couldn't really tell you. I got busted in March, and you—

"Q. So some time after you were arrested? A. Yeah.

"Q. *Did you have a hunch that the man had identified you as the robber?* A. No.

" . . . . . . . . . . . . .

"Q. *Now, do you think this gas station attendant lied to the police when he said that man number four* [*i.e., defendant*] *is the one?* A. He didn't say it was the one.

"Q. What did he say? A. He says I think that looks like him or something. I don't remember, but I know he didn't make a positive I.D., from my recollection of the words. It didn't look like a positive I.D." (Italics added.)

questions and comments were objectionable. Second, they went to the critical issue of identity. Third, the case must be considered close, since there was no eyewitness or physical evidence linking defendant to the crimes. Accordingly, we hold that the referee did not err in concluding that absent Parrish's failings with regard to the issue of the victim's extrajudicial identification of defendant, it is reasonably probable that an outcome more favorable to defendant would have resulted.

■ The Attorney General's third objection is that the referee erred in concluding that Parrish provided defendant with ineffective assistance by failing to take steps pretrial to determine whether he had obtained discovery of all the material to which he was entitled relating to Shay and the Cowdells. We agree. Assuming arguendo that Parrish's failure in this regard constitutes incompetence, defendant has simply not shown that he suffered any prejudice therefrom: he does not even raise a suspicion, less still establish, that any additional significant material existed. Thus, we hold that the referee's conclusion on this point was error and, as such, cannot be accepted.

■ The Attorney General's fourth objection is that the referee erred in concluding that Parrish provided defendant with ineffective assistance by failing to test the testimonial competence of Sylvia Ontiveros and Sharla Cowdell. Here too we agree. We shall assume for argument's sake that on the basis of such statements of defendant as that Ontiveros was "not mentally all together," that Cowdell was "not mentally there," and that both were "[drug] burnouts, not able to think clearly and their recollection is no good," Parrish should have objected to the competence of the women or at least have undertaken some investigation into the matter. But even if Parrish's failure constituted incompetence, defendant falls short of showing that he suffered prejudice: he does not establish there is any possibility that either woman would have been declared incompetent. Thus, on this point too the referee's conclusion was error.

■ Finally, the Attorney General objects to the referee's conclusion that Parrish provided defendant with ineffective assistance by failing to move pretrial to suppress the intercepted telephone call or to object at trial to its introduction. He argues in substance that the call was plainly admissible and hence that Parrish's failure to challenge it cannot be regarded as incompetence. The premise, however, is false, and therefore the argument must fail.

At the threshold we observe that the telephone call was of critical importance to the prosecution's case. Like the statements defendant allegedly made to Sylvia Ontiveros, Shay, and the Cowdells, it links him to the crimes

charged—directly to the August 1978 robbery and indirectly to the murder. Unlike those statements, it was testified to by a person of unquestioned credibility—Officer Guerra.

■ Turning to the premise of the Attorney General's argument, we conclude that the intercepted telephone call was not beyond challenge. It is undisputed that the police officers entered defendant's apartment without a warrant. Such an entry, of course, presumptively violates the Fourth Amendment and taints the evidence seized as a result. (E.g., *Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 749-750 [80 L.Ed.2d 732, 742-743, 104 S.Ct. 2091, 2097]; *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 453-455 [29 L.Ed.2d 564, 575-576, 91 S.Ct. 2022]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-276 [127 Cal.Rptr. 629, 545 P.2d 1333]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 882 [109 Cal.Rptr. 304, 512 P.2d 1208].) The presumption of unlawfulness, to be sure, can be rebutted—but the burden rests squarely on the prosecution. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23]; see, e.g., *Welsh* v. *Wisconsin, supra,* at p. 749 [80 L.Ed.2d at pp. 742-743, 104 S.Ct. at p. 2097]; *People* v. *Ramey, supra,* at pp. 270-277.) ■ Had Parrish challenged the call, the prosecution may well have been successful in rebutting the presumption of unlawfulness. But because Parrish failed to do so, the state of the record precludes us from speculating on the issue. Accordingly, we cannot accept the Attorney General's claim that the call was plainly admissible.[11]

We conclude that to the extent that we have sustained the referee's findings and upheld his conclusions we should adopt them as our own, and hereby do so. It follows that defendant was denied his constitutional right to the effective assistance of counsel and hence that he is entitled to the relief for which he prays. For the foregoing reasons we conclude that the petition for writ of habeas corpus must be granted and that accordingly the judgment of conviction must be vacated.

The petition for writ of habeas corpus in Crim. 23178 is granted. The judgment in Crim. 21436 is vacated and petitioner is remanded to the Superior Court of Santa Clara County. Upon finality, the clerk shall remit a certified copy of this opinion and order to the superior court for filing, and respondent shall serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision 2. (*In re Hall, supra,* 30 Cal.3d at p. 435, fn. 9.)

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

---

[11] We wish to make it clear that we do not decide here that the prosecution cannot rebut the presumption of unreasonableness, and thus do not foreclose it from attempting to do so when and if defendant raises the search and seizure issue on retrial.

**MOSK, J.,** Concurring.—My opinion prepared for the court addresses only defendant's contention that his trial counsel, Jefferson M. Parrish, Jr., failed to provide him with effective assistance, and does so because the resolution of that single issue is all that is needed to dispose of this case. I am, of course, in full agreement with the views expressed in that opinion. I write separately, however, because I believe a discussion of three other contentions—in my view, the only other potentially meritorious guilt-phase issues raised by defendant—seems to help reveal the magnitude of Parrish's incompetence.

## I

Defendant contends that in violation of the *Wheeler* rule the prosecutor, George Kennedy, used his peremptory challenges to strike Hispanics from the jury on the ground of group bias alone, and that as a result the judgment must be reversed. (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) Assuming for the time being that the merits could be reached in the absence of any attempt on the part of Parrish to raise the point below, the contention, as I shall explain, appears to be meritorious.

The facts relevant to this issue are set forth at length in the majority opinion, *ante,* at pages 180-181.

In *Wheeler* this court established the law applicable here. There is a rebuttable presumption that a party exercising a peremptory challenge is doing so on a constitutionally permissible ground. If a party believes his opponent is using his challenges improperly, he must timely raise the point and make a prima facie case of such discrimination. He should (1) make as complete a record as is feasible, (2) establish that the persons excluded are members of a cognizable group, and (3) show a strong likelihood that such persons are being challenged because of their group association. To make such a showing, the party may demonstrate that his opponent has struck most or all of the members of the identified group or has used a disproportionate number of his peremptories against the group. He may also show that the jurors in question share only membership in the group and in all other respects are heterogeneous. He may also establish that his opponent failed to engage these jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, he may show that he is himself a member of the excluded group and that his alleged victim is a member of the group to which the majority of the remaining jurors belong. If the court finds that a prima facie case has been made, the burden shifts to the other party to show the peremptory challenges in question were properly exercised. To sustain his burden he must satisfy the court such peremptories were exercised for reasons of specific bias. If the court finds that he does not

sustain this burden, the presumption of the validity of the questioned peremptory challenges is rebutted. (22 Cal.3d at pp. 280-282.)

The record appears to contain facts sufficient to support an inference that the prosecutor was using his peremptory challenges to strike prospective jurors on the ground of group bias alone. To begin with, Robert A. Bagnod was a member of the Hispanic community, Amelia Maes, Lupe Jiminez, Jose Flores, and C. Carrie Corral evidently were, and Alan F. Porcella may have been. Hispanics are, of course, a cognizable class for purposes of *Wheeler* analysis. (*People* v. *Trevino* (1985) 39 Cal.3d 667, 683 [217 Cal.Rptr. 652, 704 P.2d 719]; *People* v. *Harris* (1984) 36 Cal.3d 36, 51 [201 Cal.Rptr. 782, 679 P.2d 433] [plur. opn.].)

Further, there seems a strong likelihood that these prospective jurors were challenged because of their ethnicity rather than because of any specific bias. First, they appear to share only membership in the Hispanic community and to differ from each other in other respects. For example, Bagnod was married, worked in a blue collar job, and had no friends in law enforcement; Maes was 37 years old, was employed by an electronics firm evidently in a managerial or supervisory position, was married to a white collar worker, and had 5 children between the ages of 5 and 17; Jiminez was apparently in her mid to late 20's, was married to a man who was employed by an automobile manufacturer, had 2 children, and worked outside the home; Flores was an aircraft mechanic, had 3 teenage children, and was married to a woman who worked in a commercial laundry; Corral was a nurse and was apparently near retirement age, her husband was a retired blue collar worker, and they had a 28-year-old married son; Porcella was a community college instructor, had 4 young children, and was married to a woman who did not work outside the home, and had relatives in law enforcement; Michael A. Logan was 20 years old and married.

Second, the circumstance surrounding the exercise of the peremptory challenges are significant. Specifically, the prosecutor struck Bagnod after he engaged in brief and unremarkable voir dire. He struck Maes, Jiminez, Flores, Corral, Porcella, and Logan without conducting any examination at all.

Third, defendant is himself a member of the Hispanic community. The significance of this factor, however, appears to be reduced somewhat by the fact that the victim too was Hispanic.

Finally, the challenged Hispanic prospective jurors "included a number of individuals whose background indicated that, absent their [ethnicity], they would in all probability have been considered desirable jurors by the

prosecutor . . . ." (*People* v. *Allen* (1979) 23 Cal.3d 286, 294 [152 Cal.Rptr. 454, 590 P.2d 30].) For example, Maes said that a first cousin of hers had been the victim of a homicide and expressed views strongly favorable to the death penalty. Flores also expressed views favorable to the death penalty. Corral stated that about four years previously her home had been burglarized and some items of personal property, including her husband's credit cards, had been stolen, that a suspect was apprehended but subsequently convicted only of using the credit cards, and that in her opinion the police "did the best they could" on the case.

I would conclude that the foregoing evidence appears to make a prima facie case of group bias.[1]

The record would not support a finding that the prosecutor was exercising his peremptory challenges properly. As to the challenge to Jiminez, which the prosecutor expressly addressed at the *Wheeler* hearing, it is doubtful that justification appears. The prosecutor said, "My state of mind on excusing Spanish speaking jurors I did excuse was that, for example, Mrs. Jiminez knew the defendant from high school." Had Jiminez known or even been acquainted with defendant in high school, the prosecutor's challenge may perhaps have seemed proper. But on voir dire, Jiminez stated only that she had seen defendant at their high school 13 years before and had had no other contact with him. The Attorney General urges us to speculate that the prosecutor may have acted under the assumption that "a shared experience with the [defendant] could make it difficult for the juror to be as objective as the prosecutor would want." In view, however, of the minimal nature of the "shared experience" as it appeared under questioning by the court and the defense, and in view of the fact that the prosecutor asked no questions to probe that "experience" or for any other purpose, I decline to indulge in such speculation.

Regarding his challenge of the other prospective jurors, the prosecutor presented no express justification and none clearly appears from the record. The Attorney General suggests some possible reasons for the striking of Maes, Flores, Porcella, Corral, and Logan. But as this court recently emphasized, "[O]ur concern is with the explanation the prosecutor gave to the trial court, not with a theory subsequently devised by the Attorney General for consumption on appeal." (*People* v. *Turner* (1986) 42 Cal.3d 711, 722,

---

[1] I recognize that my conclusion is contrary to that of the trial court. I commend the court for raising the *Wheeler* issue sua sponte. But for the foregoing reasons I am compelled to disagree. Fault, however, should be placed not with the court but with Parrish: it was his responsibility to assist the court by at least attempting to make a prima facie case; but in the face of significant evidence that the prosecutor was unconstitutionally exercising his peremptory challenges, he simply did nothing.

fn. 7 [230 Cal.Rptr. 656, 726 P.2d 102]; accord, *People* v. *Wheeler, supra,* 22 Cal.3d at p. 283, fn. 30.) In any event, the Attorney General frankly admits that Bagnod "presented no apparent reasons for his challenge" and declines even to attempt to suggest any. In so doing, he effectively concedes that the prosecutor improperly struck Bagnod and thereby violated the *Wheeler* rule. The exercise of one improper challenge is, of course, sufficient to establish a violation. This is because "a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277).

If the prosecutor used his peremptory challenges to strike members of a cognizable group solely on the ground of group bias, as the record here appears to show, reversal would be required. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 283, and cases cited.) Why this is so is plain: "The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' " (*Id.* at p. 283, quoting *People* v. *Riggins* (1910) 159 Cal. 113, 120 [112 P. 862].)

Although defendant's *Wheeler* contention thus appears to be substantial, I believe the merits could not be reached: because Parrish made no attempt whatever to raise the issue at any time during the proceedings below, the point is not preserved for appeal but must be deemed waived (*People* v. *Haskett* (1982) 30 Cal.3d 841, 860 [180 Cal.Rptr. 640, 640 P.2d 776]; *People* v. *Jurado* (1981) 115 Cal.App.3d 470, 491-492, fn. 20 [171 Cal.Rptr. 509]).

In holding that "it is necessary that a *Wheeler* objection be made at the earliest opportunity during the voir dire process," the court in *People* v. *Ortega* (1984) 156 Cal.App.3d 63, 69 [202 Cal.Rptr. 657], gave "several practical reasons." "First, an early objection will facilitate the moving party's counsel in making the best possible prima facie case. Second, an early objection will place the opposing party on notice so that counsel may consider whether and on what basis to continue using peremptories against cognizable group members and to prepare to make the best explanation feasible. Third, an early objection will alert the court so that it can intelligently rule on the questions of prima facie case and, if one is found, explanations. In other words, this procedure will insure that the court will pay close attention to the questions asked of and answered by the jurors and other matters bearing on the use of peremptory challenges. The longer the party waits to make a *Wheeler* motion the less feasible it will be for the court to recall specific questions and answers and the demeanor of the jurors.

[¶] Fourth, this procedure will promote the efficient and economic administration of justice by permitting the court, if it finds discrimination in the use of peremptory challenges, to dismiss the existing jury panel and obtain a new panel without having to wait until the selection process has been completed. [¶] Finally, this procedure will help the courts and parties achieve the most fair and correct result, both below and on appeal." (*Id.* at pp. 69-70.)

Here, because Parrish neither raised the issue nor pressed it after the court had done so, the record is not as complete as a reviewing court would need to determine whether a prima facie case of group bias appears. For example, a court could not discern what percentage of the Hispanic prospective jurors the prosecutor struck or whether he used a disproportionate number of his peremptories against the group.

Moreover, because Parrish did nothing—and the court, evidently as a result of his nonfeasance, did little more—to put the prosecutor on notice that a justification of his use of peremptories was required, the record is not as complete as a reviewing court would need to determine whether the prosecutor struck the prospective jurors on proper grounds.

Hence, because the record is incomplete and the incompleteness must be attributed to the failure of Parrish to raise the *Wheeler* issue or to press it when the court did so on its own motion, I would conclude the point has not been preserved for appeal and accordingly would be compelled to reject the contention without reaching the merits.

## II

Defendant contends that the intercepted telephone call should not have been admitted and that its introduction into evidence was prejudicial. Assuming for the time being that the merits could be reached in the absence of any attempt on the part of Parrish to raise the point below, the contention, as I shall explain, appears to be sound.

The applicable substantive law is well settled. Under the Fourth Amendment a warrantless entry by the police into a residence is presumptively unreasonable and therefore unlawful. (E.g., *Welsh* v. *Wisconsin* (1984) 466 U.S. 740, 749-750 [80 L.Ed.2d 732, 742-743, 104 S.Ct. 2091, 2097]; *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-276 [127 Cal.Rptr. 629, 545 P.2d 1333].) The rule applies whether the entry is made to search for evidence (e.g., *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 453-455 [29 L.Ed.2d 564, 575-576, 91 S.Ct. 2022]; *People* v. *Dumas* (1973) 9 Cal.3d 871, 882 [109 Cal.Rptr. 304, 512 P.2d 1208]) or to seize a person (e.g.,

*Welsh, supra,* at p. 748 [80 L.Ed.2d at p. 742, 104 S.Ct. at p. 2097]; *Ramey, supra,* at pp. 270-276).

When exigent circumstances are present, failure to comply with the warrant requirement is not fatal. (E.g., *Welsh, supra,* 466 U. S. at p. 748 [80 L.Ed.2d at p. 742, 104 S.Ct. at p. 2097]; *Ramey, supra,* 16 Cal.3d at pp. 270-277.) It is established, however, that "exceptions to the warrant requirement [under the exigent-circumstances rubric] are "few in number and carefully delineated'. . . ." (*Welsh, supra,* at p. 749 [80 L.Ed.2d at p. 743, 104 S.Ct. at p. 2097]; see, e.g., *Ramey, supra,* at pp. 270-277.) Only two exceptions are potentially applicable on the facts before us: hot pursuit of a fleeing felon (*United States* v. *Santana* (1976) 427 U.S. 38, 42-43 [49 L.Ed.2d 300, 305-306, 96 S.Ct. 2406]; *Warden* v. *Hayden* (1967) 387 U.S. 294, 298-299 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642]), and prevention of the imminent destruction or removal of evidence (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 35 [26 L.Ed.2d 409, 413-414, 90 S.Ct. 1969]). The United States Supreme Court, moreover, has made it plain that each of these two exceptions must be narrowly construed. The former requires an "immediate or continuous pursuit of the [felon] from the scene of a crime." (*Welsh, supra,* at p. 753 [80 L.Ed.2d at p. 745, 104 S.Ct. at p. 2099].) The latter requires that the threatened destruction or removal be imminent. (See *Vale, supra,* at p. 35 [26 L.Ed.2d at pp. 413-414].)

Failure to comply with the warrant requirement is also not fatal when consent is given. (E.g., *Vale, supra,* at p. 35; *People* v. *Leib* (1976) 16 Cal.3d 869, 873 [129 Cal.Rptr. 433, 548 P.2d 1105].) To be effective, consent must be voluntary. (E.g., *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 222 [36 L.Ed.2d 854, 860, 93 S.Ct. 2041]; see, e.g., *Bumper* v. *North Carolina* (1968) 391 U.S. 543, 548 [20 L.Ed.2d 797, 802, 88 S.Ct. 1788].)

"Voluntariness is a question of fact to be determined from all the circumstances . . . ." (*Schneckloth* v. *Bustamonte, supra,* 412 U.S. at pp. 248-249 [36 L.Ed.2d at p. 875].) Among the factors bearing on the issue is whether "consent has been obtained while the consenting party was confronted by many police officers. The presence of a number of policemen is likely to suggest that the police are contemplating an undertaking which does not depend upon the cooperation of the individual from whom permission to search is being sought. Thus, although it is true that 'the presence of a large number of officers . . . does not present a situation which is per se coercive,' that fact in tandem with others may well result in a finding that the consent was not voluntary." (2 LaFave, Search and Seizure (1978) § 8.2(b), p. 642, fn. omitted [hereinafter LaFave].) Another factor is whether the consenter experienced a "significant interruption of his liberty

of movement as a result of police actions' [citation]." (*People* v. *Springer* (1983) 92 App.Div.2d 209, 213 [460 N.Y.S.2d 86]; see generally *People* v. *James* (1977) 19 Cal.3d 99, 111, fn. 10 [137 Cal.Rptr. 447, 561 P.2d 1135].)

It is important to observe, moreover, that "When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have been given by the consent." (2 LaFave, *supra*, § 8.1(c), p. 624, and authorities cited; accord, *People* v. *Harwood* (1977) 74 Cal.App.3d 460, 466 [141 Cal.Rptr. 519]; *People* v. *Superior Court* (*Arketa*) (1970) 10 Cal.App.3d 122, 127 [89 Cal.Rptr. 316].)

If the challenged police conduct is violative of the Fourth Amendment, of course, the exclusionary rule requires that all evidence obtained as a result of such conduct be suppressed. (E.g., *Mapp* v. *Ohio* (1961) 367 U.S. 643, 646-660 [6 L.Ed.2d 1081, 1085-1093, 81 S.Ct. 1684]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 445-450 [282 P.2d 905, 50 A.L.R.2d 513].)

The law on the evidentiary burdens to which the parties are subject is also well settled. The defendant bears the burden of showing that the police officers acted unlawfully. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) When the defendant has shown a warrantless entry, the burden shifts to the prosecution to prove that the entry was nevertheless reasonable. (*Ibid.;* see, e.g., *Welsh, supra,* 466 U.S. at p. 748 [80 L.Ed.2d at p. 742, 104 S.Ct. at p. 2097]; *Ramey, supra,* 16 Cal.3d at pp. 270-277.) The prosecution may carry its burden by showing the presence of exigent circumstances—a burden that is heavy indeed. (*Welsh, supra,* at p. 748 [80 L.Ed.2d at p. 742, 104 S.Ct. at p. 2097]; see, e.g., *Ramey, supra,* at pp. 270-277.) It may also carry its burden by showing voluntary consent. (E.g., *Bumper* v. *North Carolina, supra,* 391 U.S. at p. 548 [20 L.Ed.2d at p. 802]; *People* v. *Shelton* (1964) 60 Cal.2d 740, 744-745 [36 Cal.Rptr. 433, 388 P.2d 665].) When the prosecution relies on consent, it must also "prove that [the search] was *within* the scope of the consent given." (*People* v. *Harwood, supra,* 74 Cal.App.3d at p. 466.)

On my review of the record, the intercepted telephone call appears to have been inadmissible as the product of unlawful police conduct. It is undisputed that Officers Webster, Habina, and Guerra entered defendant's apartment without a warrant. It does not appear that exigent circumstances existed. The police do not seem to have been engaged either in the "immediate or continuous pursuit of the · [felon] from the scene of a crime" (*Welsh, supra,* 466 U.S. at p. 753 [80 L.Ed.2d at p. 745, 104 S.Ct. at p. 2099]), or in the prevention of the imminent destruction or removal of evidence (*Vale, supra,* 399 U.S. at p. 35 [26 L.Ed.2d at pp. 413-414]).

Rather, they seem simply to have been attempting to determine defendant's whereabouts.

Moreover, it appears doubtful that Lawrence Santiago and Millie Dominguez voluntarily consented to the entry. Although Officer Guerra testified that she and the other officers were "invited in," it seems that on being confronted by three armed and uniformed officers Santiago and Dominguez had little choice in the matter. But even if they voluntarily consented to the entry, there is no evidence that they gave consent to search. And in any event they do not appear to have consented to the interception of the telephone call. On their arrival, the police announced they were looking for defendant. Hence, any consent Santiago and Dominguez gave on the officers' arrival appears to have extended only to a search for defendant's person. Once the police entered, they ordered Santiago and Dominguez to remain in the living room and not to move, then searched for defendant throughout the apartment. After they finished their search without finding defendant, the telephone rang; the police prohibited Santiago and Dominguez from answering it; and Officer Guerra picked up the receiver, identified herself in Spanish as "Millie," and intercepted the statement allegedly made by defendant. In view of the fact that at the time the telephone rang Santiago and Dominguez were "confronted by many police officers" (2 LaFave, *supra,* § 8.2(b), p. 642), and had experienced a "significant interruption of [their] liberty of movement as a result of police action'" (*People v. Springer, supra,* 92 App.Div.2d at p. 213), they do not appear to have given voluntary consent to the interception of the telephone call.

The introduction of the intercepted telephone call could not easily be held harmless. Because defendant's right to be free of unreasonable searches and seizures guaranteed by the Fourth Amendment is involved, the court would be compelled to apply the reversible error test set out in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. That test provides that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24 [17 L.Ed.2d at pp. 710-711].) The *Chapman* court reiterated the approach it had adopted in *Fahy* v. *Connecticut* (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229]: "The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (*Id.* at pp. 86-87 [11 L.Ed.2d at p. 173].) When a fundamental constitutional right is at issue, under this standard erroneous evidentiary rulings are seldom harmless: "An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless." (*Chapman* v. *California, supra,* at pp. 23-24 [17 L.Ed.2d at pp. 710-711].) Here the intercepted telephone call was plainly relevant to the case, tending to show

as it does that defendant was involved in the August 1978 robbery and consequently had a motive to commit murder. Moreover, because the statement ment was allegedly made by defendant himself, the intercepted telephone call may well have influenced the jury.

Even though the contention appears to be substantial, I believe the merits could not be reached because of Parrish's failure to preserve the issue by a timely challenge of the police conduct. (*People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706]; *People* v. *Jenkins* (1975) 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857]; *People* v. *Gallegos* (1971) 4 Cal.3d 242, 249 [93 Cal.Rptr. 229, 481 P.2d 237].) Had Parrish made such a challenge, the prosecutor would have been put on notice and might have presented evidence and argument to show that the entry was lawful or that the intercepted telephone call was admissible. (*People* v. *Flores* (1968) 68 Cal.2d 563, 567 [68 Cal.Rptr. 161, 440 P.2d 233].) Hence, I would conclude the point has not been preserved for appeal and accordingly would be compelled to reject the contention without reaching the merits.

### III

Defendant contends that the prosecutor engaged in misconduct on several occasions. Assuming for the time being that the point is preserved on appeal in spite of the fact that Parrish failed in each instance to make any objection whatever, the contention appears to have merit.

The term "prosecutorial misconduct" implies "a dishonest act or an attempt . . . to persuade the court or jury by the use of deceptive or reprehensible methods." (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; accord, *People* v. *Chojnacky* (1973) 8 Cal.3d 759, 766 [106 Cal.Rptr. 106, 505 P.2d 530] [plur. opn.].) Accordingly, the term includes all acts designed to obtain victory by improper means. "Whether the prosecution has committed misconduct depends upon the particular circumstances of each case and bad faith must be shown to establish the existence of misconduct . . . ." (*People* v. *Romo* (1975) 47 Cal.App.3d 976, 987 [121 Cal.Rptr. 684]; accord, *People* v. *Gomez* (1976) 63 Cal.App.3d 328, 338 [133 Cal.Rptr. 731].)

Defendant raises several complaints. First, he claims the prosecutor engaged in misconduct by striking Hispanics from the jury on the ground of group bias alone. Because the *Wheeler* issue, as I have explained, appears to have merit, so too does this point.

Defendant also claims that the prosecutor's repeated comments and questions relating to the victim's extrajudicial identification were deliberate at-

tempts to place before the jury evidence he had committed himself not to introduce, and as such amounted to misconduct. This point also appears to have merit.

Although the prosecutor refrained from introducing the extrajudicial identification directly, he nevertheless repeatedly placed it before the jury through comments and questions. For example, at the beginning of his opening statement he made his first reference to the identification: "Mr. Flores got a license number that was involved and gave the license number to the police. The police did some investigating with respect to the license number. Then they compiled a folder with a lot of photographs in the folder. One of these photographs was of Mr. Ledesma. The San Jose Police Department then took this folder with the photographs, and including photographs of Mr. Ledesma, out to the gas station and they contacted Mr. Flores there and asked him if he recognized anyone in these photographs, in no way indicating that one of these people was a suspect. [¶] Now, as a result of that, a complaint was issued against Mr. Ledesma *being identified as the man who committed the robbery of the gas station . . . .*" (Italics added.) At another point in his opening statement he said: "And further [defendant] was quite upset with Mr. Flores, hard-working young man, *for identifying him, having the nerve to identify Mr. Ledesma as the robber.*" (Italics added.)

In his questioning of witnesses the prosecutor unmistakably implied that the victim had identified defendant. Examining Sylvia Ontiveros, he asked: "Did Fermin ever tell you how he found out that the witness identified him?"

In his closing argument the prosecutor placed the extrajudicial identification before the jury yet again. At one point he said: "You have a motive, you have flight, you have the license number, *you have the identification from a photograph.*" (Italics added.) At another he stated: "It isn't just the license number. It's the motive. *It's the identification.*" (Italics added.) At still another point he said: "[If you vote for acquittal,] You're going to be saying that it's reasonable that there was a misidentification by the victim when the victim was just looking at photographs, didn't have any idea about the size, the way the person talked. Didn't know which one had the motorcycle when he was looking at the pictures and identified Mr. Ledesma. All he had was a face. Picked him out, just looking at the face. Not knowing anything else about him, not hearing his speech, not knowing that he had the motorcycle that was used in the crime. Not knowing how the man was dressed and so on. Just a face. *That's the man he picked out.* And saying all of these things could have been cooked up, could have been contrived."

It is misconduct for the prosecutor to refer in his argument to facts not in evidence. (E.g., *People* v. *Kirkes* (1952) 39 Cal.2d 719, 724 [249 P.2d 1]; *People* v. *Evans* (1952) 39 Cal.2d 242, 251 [246 P.2d 636].) It is also misconduct for him to suggest the existence of such facts through the questions he asks. (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619-620 [119 Cal.Rptr. 457, 532 P.2d 105], and cases cited.)

Under these rules the prosecutor plainly appears to have engaged in misconduct: in argument and examination he repeatedly referred to the victim's extrajudicial identification of defendant and treated it as though it were a fact in evidence. The prosecutor's comments and questions were improper because through them he manifestly intended to do, and did in fact do, indirectly the very thing that he had committed himself not to do directly— i.e., place before the jury the victim's extrajudicial identification of defendant.

I recognize, to be sure, that jurors are commonly instructed—as were the jurors here—that statements by counsel are not evidence. I also recognize that it must generally be presumed that jurors can and will follow the instructions given to them. Nevertheless, I do not believe that the instruction that counsel's statements are not evidence makes the comments and questions at issue here proper or even cured them of their taint. The danger that such comments and questions may mislead is by no means imaginary or negligible. Indeed, it is plain that the jurors in this case were in fact misled. Although in his testimony about the photographic display Sergeant Traskowski did not actually say that the victim had identified defendant, and although the prosecutor emphasized at one point in closing argument that Traskowski did not so testify, the jurors evidently believed that such testimony had indeed been given: during deliberations their first request to the court was for a rereading of Traskowski's testimony "re: positive I.D., i.e., I.D. of Ledesma."

The Attorney General argues in effect that the prosecutor's comments and questions were proper because they merely stated or implied what the jurors could reasonably infer from the evidence, i.e., that the victim identified defendant. The argument must be rejected. Although a prosecutor may generally present the jurors with conclusions fairly inferable from the evidence, he may not do so when as here the conclusion effectively places before the jurors evidence he has committed himself not to introduce: otherwise, as we have explained, he would be allowed to do indirectly what he has in effect prohibited himself to do directly.

Defendant also complains that the prosecutor improperly elicited testimony that anonymous telephone callers told the police that he was the

perpetrator of crimes charged. The point is supported by the following portion of the prosecutor's cross-examination of defendant.

"Q. You have read all the police reports, haven't you? A. Yes, I have.

"Q. And do you have any idea why all those people phoned in, saying 'I don't want my name known, but'— A. Yeah, you—

"Q. 'Fermin is the guy that did it.' A. What?

". . . . . . . . . . . . . . . . . .

"Q. (By Mr. Kennedy) You were just talking about the police reports a few minutes ago. Do you remember that? A. Um-hum. I have gone over them a couple of times.

"Q. And you indicated that you knew that a bunch of people phoned in and talked about how it happened and who did it and so forth? A. Um-hum.

"Q. Now, why do you suppose all those people wanted to frame you up, back there at that time? A. I don't know. I don't even know some of the people. Some people said Jack in the Box—they heard it from other people, you know, some lady says that some guy works with her. He's just got out of prison or somebody is on parole. You don't want his name mentioned and—so he's going through her.

"Q. All right. Let's talk about her for a minute. This is the lady who works at a local factory? A. I have to look at my notes. Can I get them?

"Q. Well, let's just talk about what you remember, if you don't mind.

". . . . . . . . . . . . . . . . . .

"Q. (By Mr. Kennedy) Now, you indicated that one of these anonymous tips that you recall was from a man who overheard you talking at the Jack in the Box. Isn't that right? A. I didn't say that."

Also relevant on the point is the question the prosecutor posed to Sergeant Kahn on redirect examination on rebuttal and the answer the officer gave: "Q. Have [the anonymous tipsters] all said Fermin was the one who actually did the killing . . .? A. That's correct."

It is misconduct for a prosecutor to "intentionally elicit inadmissible testimony." (*People* v. *Sims* (1976) 64 Cal.App.3d 544, 554 [134 Cal. Rptr.

566]; accord, *People* v. *King* (1968) 266 Cal.App.2d 437, 464 [72 Cal.Rptr. 478], citing authorities.) Here it would be difficult to find that the prosecutor did not know that the evidence he elicited was inadmissible—it was plain hearsay—or that he did not intentionally elicit such evidence—the purpose of his questioning was manifestly to obtain the very evidence he did in fact obtain. Thus, in this regard the prosecutor appears to have engaged in misconduct.

Turning from the question whether the prosecutor engaged in misconduct, I observe that it would be difficult to hold that the misconduct was harmless. The case was evidently close; therefore, the extrajudicial identification was crucial in establishing who robbed the victim on August 26, 1978, and hence who killed him a week and a half later. It follows that there would be a reasonable probability that but for the prosecutor's misconduct an outcome more favorable to defendant would have resulted.

Nevertheless, although defendant's claim that the prosecutor engaged in prejudicial misconduct appears substantial, I believe it is not preserved for appeal and hence could not be resolved on its merits but would have to be rejected at the threshold. To preserve such a point, "misconduct must be assigned as error at trial with a request that the jury be instructed to disregard its effect . . . ." (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 723 [135 Cal.Rptr. 392, 557 P.2d 976], disapproved on another ground in *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal. Rptr. 1, 609 P.2d 468].) Simply to object or make the assignment of misconduct without seeking a curative admonition is generally not enough. (*People* v. *Beivelman, supra,* 70 Cal.2d at p. 75.) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*People* v. *Green, supra,* at p. 27.) Here Parrish failed to make any objection whatever to any of the instances of misconduct raised on appeal.

To the rule requiring an assignment of misconduct and a request for a curative admonition in order to preserve a claim of prosecutorial misconduct, there is, as the court held in *People* v. *Green, supra,* 27 Cal.3d at page 34, a single exception: a reviewing court may nevertheless reach the merits of such a claim if a timely assignment of misconduct and request for admonition would not have cured the harm. The exception, however, appears not to be applicable on this record: defendant fails to show that any instance of prejudicial misconduct was incurable. This is clear, for example, with regard to the prosecutor's references to the victim's extrajudicial identification of defendant. A timely assignment of misconduct and admonition to the first comment, which seems not prejudicial in itself, would likely

have cured the harm and would also, I assume, have deterred the prosecutor from engaging in further misconduct of the same sort. "There is accordingly no ground to excuse defendant from the general requirement of a timely objection, and the point must be deemed waived." (*People* v. *Green, supra,* at p. 35.)

Defendant argues that prior to *Green* a second exception existed—"where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict" (*People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136])—and that because *Green* was decided after his trial was completed, this exception should remain available to him.

It is of course the general rule that "judicial decisions apply 'retroactively.' [Citation.] Indeed, a legal system based on precedent has a built-in presumption of retroactivity." (*Solem* v. *Stumes* (1984) 465 U.S. 638, 642 [79 L.Ed.2d 579, 586, 104 S.Ct. 1338, 1341]; accord, *People* v. *Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635].) In reliance on *People* v. *Guerra, supra,* at pages 399-402, defendant maintains that *Green* should be given only prospective effect because it established a new rule of law that was contrary to a prior rule. I am not persuaded.

*Green* merely restated the well-settled rule that the issue of prosecutorial misconduct is preserved for appeal only if a timely objection was·made. That decision did indeed disapprove the language in *Berryman* quoted above. But that language, which had neither historical legitimacy nor analytical soundness, had been "ignored" by "a parallel line of cases in this court" (*People* v. *Green, supra,* 27 Cal.3d at p. 34), and hence cannot be characterized as a prior contrary rule on which justifiable reliance could have been placed and which would thereby bar the normal retroactive operation of *Green.*

Even if *Green* had in fact established a new rule when there was a prior contrary rule, prospectivity would not be compelled. In *Guerra* the court clearly implied that except where the purpose of the new rule points plainly toward prospectivity, the existence of "justifiable reliance on an old rule to the contrary" is necessary before "the courts may choose to make, on grounds of policy, an exception to 'the ordinary assumption of retrospective operation' [citation]." (37 Cal.3d at p. 401.) At the threshold, the purpose of the *Green* rule does not appear to point plainly toward prospectivity, nor does defendant contend otherwise. The possibility of prospectivity, therefore, turns on whether there was justifiable reliance. Plainly there was none:

no reasonably competent defense counsel would have relied on the "exception" stated in *Berryman* to preserve the issue of prosecutorial misconduct for appeal.

Accordingly, because I believe the point does not survive for purposes of appellate review, I would be compelled to reject defendant's claim of prosecutorial misconduct without reaching its merits.

In sum, Parrish's incompetence was of such magnitude that it not only completely undermined the reliability of the trial proceedings but also threatened to preclude defendant from raising before this court the only contentions—other than, of course, the ineffective-assistance claim—that were potentially meritorious on the issue of guilt. In light of such incompetence and the resulting prejudice to which it subjected the defense, the conclusion is inescapable: Parrish failed to provide defendant with the effective assistance of counsel.

**GRODIN, J.**—I concur in the judgment granting the petition for writ of habeas corpus and vacating the judgment of conviction. I note, however, that in his appeal defendant claims that there was insufficient evidence of an intent in carrying off the murder victim other than the murder itself. If so, retrial on that special circumstance is barred. (*Burks* v. *United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 332-333 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468].) I concur in the judgment therefore with the understanding that defendant is not precluded by our failure to address this arguably meritorious issue from asserting the bar of double jeopardy to retrial on that special circumstance allegation. (Cf. *In re Jordan* (1974) 12 Cal.3d 575, 582 [116 Cal.Rptr. 371, 526 P.2d 523].)

I concur in the decision setting aside the judgment of conviction because I agree that defendant did not receive constitutionally adequate representation by his attorney. I believe that defendant has carried the burden placed on a petitioner for writ of habeas corpus of demonstrating that counsel's performance was so inadequate and inept as to undermine confidence in the verdict, and that there was a consequent breakdown of the adversarial process toward which the constitutional guarantee is directed. Therefore, while I do not agree with the majority that defendant has demonstrated specific prejudice as a result of counsel's omissions, the judgment must be set aside.

The majority acknowledge appropriately that the standards by which reversal of a judgment for ineffective assistance of counsel is usually deter-

mined under both the Sixth Amendment guarantee of effective counsel, and the equivalent guarantee of article I, section 15, of the California Constitution, require that the defendant demonstrate that counsel's errors and omissions have caused him specific, identifiable prejudice. He must show that but for counsel's failings the decision reached would reasonably likely have been different. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 697-698, 104 S.Ct. 2052]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 583-584 [189 Cal.Rptr. 855, 659 P.2d 1144].) The majority also recognize that when a defendant collaterally attacks a judgment by petition for writ of habeas corpus he bears the burden of proving the facts upon which his right to relief turns by a preponderance of the evidence. (*In re Lawler* (1979) 23 Cal.3d 190, 195 [151 Cal.Rptr. 833, 588 P.2d 1257]; *In re Imbler* (1963) 60 Cal.2d 554, 560 [35 Cal.Rptr. 293, 387 P.2d 6].) In my view, however, petitioner has not met this burden, and the majority has not properly applied the rules under which relief is to be granted.

In particular, the majority implicitly finds prejudice in counsel's failure to further investigate and present a diminished capacity defense. The opinion nowhere identifies the manner in which such a defense might have led to a more favorable verdict, however. Instead, overlooking the burden on the defendant, the majority assert that *the People* have not shown that a more favorable result would not have resulted had counsel presented such a defense. The question, however, is whether defendant has offered evidence that counsel should have discovered that would have supported a diminished capacity defense, and which, if offered, might have led to a more favorable verdict.

Although medical and psychiatric experts offered evidence at the habeas corpus reference hearing on the impact of PCP on the cognitive abilities of a user, and one testified that he believed defendant would have had diminished capacity to form intent, neither had examined the defendant. More importantly, neither offered an opinion on whether a person suffering from the type of diminished capacity he believed would have been present in defendant could have had an intent to steal. In a felony-murder prosecution, of course, it is not necessary to establish that the defendant had the ability to or did intend to kill or to premeditate the killing, to deliberate, or to harbor malice. All that must be established is that the killing occurred during the commission of, or attempted commission of, as in this case, a robbery. The only mental state that might be affected by diminished capacity in such case would be the intent to permanently deprive the victim of his property. The record offers no basis on which to suspect that defendant was unable to achieve this state of mind, or that evidence of drug ingestion might

have persuaded the jury that he was not guilty of first degree robbery based on a felony-murder theory.

The majority next faults counsel for failing to move pretrial to exclude reference to the victim's extrajudicial identification of defendant. Two aspects of the prejudice analysis flowing from this omission trouble me. First, although pretrial *"in limine"* motions are common practice, the failure to make such motions cannot itself be considered prejudicial in circumstances in which a ruling on the motion is not binding at trial. As we had occasion to note in *People* v. *Campa* (1984) 36 Cal.3d 870, 885-886 [206 Cal.Rptr. 114, 686 P.2d 634], except as to motions made pursuant to Penal Code section 1538.5, rulings on such motions are subject to reconsideration at trial when the evidence is actually offered, and if objection is not made at that time the objection is waived notwithstanding the pretrial ruling. (See *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 735 [125 Cal.Rptr. 798, 542 P.2d 1390]; *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257, 266 [61 Cal.Rptr. 510]; *People* v. *Beasley* (1967) 250 Cal.App.2d 71, 76-77 [58 Cal.Rptr. 485].) For that reason, only the objection at trial is crucial. In addition, it is far from clear that evidence of the out-of-court identification of defendant by the victim was inadmissible hearsay. That conclusion assumes that the only relevance of that evidence was for the truth of the victim's statement—that defendant was the robber. But the statement was also relevant to establish that defendant, being aware of the identification, had a motive for the murder—to eliminate the witness—and thus to establish the identity of the killer. Counsel's failure in this regard, therefore, does not support the conclusion that his performance here caused specific prejudice to defendant by permitting the jury to learn of the identification.

Defendant similarly failed to carry his burden of establishing prejudice as a result of counsel's failure to object to admission of evidence of the intercepted telephone call. While it is true that on motion to exclude or suppress evidence seized without warrant the People bear the burden of establishing the lawfulness of the seizure, here, on habeas corpus, the defendant has the burden of establishing that a motion to exclude would have been meritorious. Thus he, not the People, must establish whether the seizure was lawful. He offered no evidence to establish that the entry and subsequent conduct of the police officers was not with the consent of the occupants of the home. In failing to establish that the evidence was inadmissible, he failed to show that he was prejudiced by counsel's failure to object.

Nonetheless, I conclude that the circumstances under which counsel undertook the representation of defendant, and under which he conducted the trial, although circumstances of his own making, were such that no attorney

could effectively present a meaningful or competent defense to a capital charge in which the issues were complex and required a skilled and loyal advocate. Counsel's failure to investigate defenses that should have been apparent to him; his failure to utilize available evidence and objections; his admission that his trial preparation and performance were essentially nil as a result of his own compulsive gambling, lack of sleep, and consequent lack of mental alertness; his abandonment of his client in proceedings subsequent to the guilt phase; coupled with the other omissions identified by the referee preclude any confidence in the verdict of first degree murder and in the appropriateness of the verdict of death.

In circumstances in which it is established that although counsel has been afforded a defendant, he is unable to discharge his duties, it is unnecessary to identify specific prejudice. "The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable error—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. . . . [I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself is [sic] presumptively prejudicial." (*United States* v. *Cronic* (1984) 466 U.S. 648, 656-659 [80 L.Ed.2d 657, 666-668, 104 S.Ct. 1338].)

I am satisfied that while defendant failed to demonstrate specific prejudice, he has established that counsel's performance was so deficient as to bring about a breakdown of the adversarial process, and that but for his omissions the outcome of the trial might not have been a verdict of first degree murder, or, at least, might not have been the imposition of a sentence of death.

I therefore concur in the judgment granting the petition for writ of habeas corpus and vacating the judgment:

Lucas, J., and Panelli, J., concurred.

APPENDIX A

## The Woods Report

Fermin was born in Corpus Christi, Texas, 3/21/51, to a migrant family. He was the fifth child in a family of eight children. During the picking season the Ledesma's traveled extensively throughout the south. Fermin and his brothers were required to pick alongside their parents. Fermin stated that during his younger years (up to 8 years old) he doesn't remember much except picking fruit, playing with his oldest brother Pascual, and Rudy, and getting beaten by his father if they misbehaved. They traveled extensively and he had no sense of a home at this time.

When Fermin was eight they moved to California to pick crops in Campbell. The family decided to stay in this area so that Fermin was enrolled in school for the first time. He was, however, put in the first grade. This was humiliating and painful to him which was coupled with the language problem. They were still required to work in the fields and Fermin states that he felt like a "slave," in that he had to work hard, give his father all the money and got little in return except beatings. (The father apparently had a second family in Mexico which he sent money to and Fermin felt resentful and used by his father—he talks of having to wear old, used clothes to school which embarassed him further with the other kids.) With regard to schooling, therefore, he was set up for failure from the onset of his "education." He began to cut school in the fifth grade, which he continued to do until he eventually dropped out in his first year of high school. He looked more and more to his street friends to fulfill his needs. He also began to sniff glue. He continued to work, however, and had his own car at 14.

His interaction with the juvenile court began at 13 and 14 where [sic] he had problems with truancy and "out of control." He spent time at Juvenile Hall, Boys Ranch and ultimately CYA for car theft during his teenage years.

A critical part of Fermin's childhood development revolves around his relationship with his father. Throughout his childhood he felt unloved by his father. He admits that he desperately wanted his father's approval and was never able to communicate with him. Fermin felt that he was merely expected to follow orders and, if he did not do so, he was beaten. His father was an extremely punitive man and Fermin has been hit with belts, cable wire, an axe handle, extension cords, or "whatever he could get his hands on."

He spoke of one time when he came home from "cutting" school and his father discovered his actions. Fermin was forced to get on his knees in front of his father and be punched in the face and all over his body. At 15 Fermin was thrown out of his home.

Another critical element of Fermin's psychological development concerned his interaction with his brother, Ray. Ray, the second eldest, was his father's favorite son. As Fermin got older, as well as his father, Ray became delegated by his father to beat up Fermin if he misbehaved. All of his father's affection and approval therefore were showered on Ray and Fermin fell resentful and rejected. To this day, the two brothers are estranged.

Violence was a common phenomena [sic] in Fermin's childhood. Fermin also observed his mother getting hit by his father. Beatings were frequent and severe. When I asked him to relay to me a happy memory from his childhood he responded, "I don't have any, only bad ones—all the beatings and the marks I got from them." In addition to beatings at home he also met with violence among his peers in the neighborhood. He told of being "rat banged" several times as a teenager as well as bearing the scars of three stab wounds from fights. (Rat banging is a phenomena [sic] where eight or ten guys jump on one person and severely beat and batter them.)

Coupled with the violence in his life, there was a lack of nurturance and emotional fulfillment. Being fifth in a family of eight, he felt as if he never got enough love or attention.

Fermin states that he never felt wanted or needed by his family. He has, in fact, been designated as the "black sheep."

Fermin stated that he never knew if his family loved him although he was sure that *he* loved them. His response, therefore, was to withdraw into himself and look for a "family" on the streets with the "wrong crowd." During our interview Fermin often repeated that he felt that his father didn't like him. He learned, subsequently, to respond to frustration, his own sense of failure and lack of love by developing a hard street attitude to protect himself—violence was a learned response (reaction) as well as a sense of rage, to pressure and became ingrained as a part of him. (My impression of talking somewhat with family members is that, in fact, only "token" concern is being given to Fermin's plight and that he *is* considered to be the black sheep. Fermin has been writing to them regularly with little response. He has also requested money which took several days to get to him. My impression is that he was often left out of family functions, etc.)

Of his brothers, Fermin felt close at one time to Pascual, the eldest. When Pascual went to Viet Nam, Fermin was 17 and he felt lonely and rejected once again. During this same year Fermin got busted with another car theft offense. Since he had already been at the Ranch, his P.O. told him that he either had to join the Army or go to Y.A. Fermin chose the Army which was ultimately a traumatic negative experience for him which further reinforced the violence and abuse he had been subjected to all of his life. While in the Army he began to go AWOL after completing boot camp and continued to return home although he did not live with his parents, rather on the streets or with his brothers. Fermin states that the reason that he didn't like the Army was because of the lack of respect as well as the treatment he received by the sergeants. He indicated that it was difficult for him to have to stand at attention and listen to them insult him as well as to [*sic*] make remarks about his mother. Because of frequent remarks and responses which Fermin gave during these interviews, it appears as if he is unable to cope with strict, unflexible, hard authority figures because of the abuse which he had been subjected to by them throughout his life (especially with regard to his father). His response to situations in which he finds himself dealing with authoritative, punitive figures is to "fight" back with all of his will in an attempt to save his own sense of self worth and dignity.

In terms of the Army, however, his resolution to the problem was simply to bear the situation which coupled with the fact that he had initially been pressured to join.

When Fermin was AWOL he managed to stay at home for long periods of time before he got caught and brought back to Fort Ord. A traumatic event occurred for Fermin during this time when the family was informed that Pascual was missing in action in Viet Nam. They subsequently informed the family that he was dead (although this later proved to be incorrect) and Fermin was deeply upset. He said that this was the final "straw" for him and the Army and that he had no desire to go back there. Unfortunately, however, his brother Ray called the MP's on Fermin informing them of his whereabouts and he was returned to Fort Ord. Ray's rationale for his actions was that he was concerned about Fermin not going anywhere with his life.

Fermin was sentenced to 96 days in the stockade. During this time, the prisoners went on strike in order to protest the prison conditions of food, etc. During a recreation break in the prison yard, all of the prisoners began yelling. Fermin yelled, "Fuck you Sergeant Thermin" and, unfortunately, an MP was behind him. He was thrown into the "hole" for 8 or 14 days (he doesn't remember). The "Hole" was a very small steel room with no bedding, heat or windows. Usually the food is pushed through an opening in the door. In Fermin's case, however, when he was fed, which was three times a day, three MP's came each time with clubs and severely battered him. His face was swollen and he was bruised all over his body. This treatment continued for the entire length of his stay in the hole. Obviously his sense of rage, hatred and violence was greatly increased by this incidence as well as his negative, powerless feelings with regard to the Army. (The other psychological effects of this incident should also be explained more in depth.) Fermin revealed to me that after he was released from the stockade, he went and got a shotgun and was waiting for the MP who did this to him after he got off of work. Fermin spoke of waiting in his car for the man to approach as he planned to

shoot him. At this time, however, Fermin still had a coping rationale mechanism inside of him which enabled him to realize that he could not do this as well as the possible consequences of his actions. He, therefore, drove home, not harming or even seeing the MP involved.

During his third AWOL time period, Fermin met and married a friend of his sister, Adelita Chiodo. He fell in love with her and they were married on March 16, 1970. In May of that year he got busted for suspicion of car theft. He fought the case and lost it. While the courts were determining whether or not he was "fit" for adult court, he was transferred to Tracy Penitentiary where he spent three months. He was 19. The parole board decided to send him to CYA and he subsequently finished his time fighting fires at Ben Lomond in Santa Cruz. During this time he was discharged from the Army.

It should be noted that Fermin has continued to work when he has been on the streets. He was a steady, reliable worker and when he got out of YA he began to build a life for himself and his wife. For the next year and a half that they were together Fermin remembers as a happy time in his life. His wife got pregnant and had twin girls. Fermin states, "I was working and we got a house which I furnished with nice things . . . we had good credit."

Adelita and Fermin split up in 1972 after Fermin found out she was cheating on him. Fermin describes this as a turning point for the worst in his life as he loved her intensely. He felt rejected and angry. After this occurred, his life-style changed dramatically. He could no longer hold down a job and wanted to spend all of his time "partying." Fermin states, "I did a lot of grass, and especially crystal [i.e., PCP]. I didn't really care about my life." He also began to get involved with a crowd of people who were involved in criminal activities.

His first serious girlfriend after his wife was a woman named Lettie. He was involved with her for four or five years but never married her because of his feelings for his wife. He did, however, love her and when they broke up last May he felt rejected once again by someone that he had loved. Lettie ended their relationship because she felt he was "getting too crazy" because of his drug consumptions of KJ [a combination of marijuana and PCP]. When I asked Fermin if this was in fact true, he affirmed. He stated that he couldn't remember things that he did and that he was not eating, losing a lot of weight, etc.

After Fermin's breakup with Lettie, he subsequently states that life for him got very bad. He lost his job and subsequently began a heavy drug involvement. "I just didn't care. . . ." "I was taking eight KJ's a day from May to August when I left for Utah." While in Utah, he also consumed LSD several times. When Fermin returned to San Jose, he once again went on a KJ binge and the four days prior to his arrest were spent in a constant high.

Fermin's drug use is a very important variable with regards to his psychological development and current mental state. He began glue sniffing at a very young age and rapidly progressed to marijuana, LSD and KJ. He states that he has been using KJ for the past seven years. He remembers several "bad trips" which he had when he got high. During these bad trips he would become very paranoid and would have hallucinations of monsters, etc. He spoke of often being so high he couldn't walk. He also stated that almost every time he got high he had hallucinations. Once an incident occurred when he was driving home high on KJ and he thought that his body was beginning to evaporate and that he would soon disappear altogether. It was terrifying to him. In addition to KJ, Fermin also has a history of using LSD. He states that he has taken more LSD than he can even remember and he would take three or four hits at a time. (It is recommended that some type of neurological testing be done on Fermin to determine the extent of damage done to him because of his drug abuse.) Fermin now describes himself as a "burn out case." He says that he often can't remember things and sometimes has trouble reading and writing. (For example, he'll be in the middle of writing a word and forget how to spell it although he used to know how.)

In essence, Fermin is a man who has learned that violence is the only way to resolve his problems. He has apparently never had nurturance in his life and has been subjected to extreme and unusual violent abuse. In every incident that he in fact gave his love and trust to someone in his life, he was rejected by them. His family seems to have little interest in him although he is making attempts to reach out to them. Lack of approval or affection by his father has also seriously damaged his self image. He describes himself as a loser and a loner

who has no friends and this, in fact, seems to be true. Throughout his life he often speaks of feeling alone. When I asked Fermin what he thought his problems were, he responded, "I don't worry about the future . . . I just live for today."

Throughout my interviews with Fermin of his life history, I was aware of a tragic sense of rage which was building up in him throughout his life because of the oppressive violent environment which he lived in and his particular situations and occurrences. He seemed like a clock which was getting wound up too tight. Intuitively, I feel as if Fermin is a man with a lot of potential. I've also identified some positive attributes; such as, his love of his daughters, etc. He has, however, adopted a hardened attitude to cover his pain.

In summary, there are several important elements which we could key into:

1. Battered child—effects of.
2. Lack of love and bonding (a psychologist could assess this—he was separated from his mother for four days at birth because of a mouth operation so that the important bonding never took place.
3. Violent role models.
4. Time spent in the "hole" and how he was beaten—effects of this psychologically.
5. Break up and rejection of his wife and others he loved.
6. Drugs—effects of KJ—LSD, etc.